Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

HUGUES GERVAT, derivatively on behalf of QUANTUMSCAPE CORPORATION,

    Plaintiff,

    v.

JAGDEEP SINGH, FRITZ PRINZ, TIMOTHY HOLME, KEVIN HETTRICH, FRANK BLOME, BRAD BUSS, JOHN DOERR, JÜRGEN LEOHOLD, JUSTIN MIRRO, DIPENDER SALUJA, J.B. STRAUBEL, and VOLKSWAGEN GROUP OF AMERICA INVESTMENTS, LLC,

    Defendants,

    and

QUANTUMSCAPE CORPORATION,

    Nominal Defendant.

Case No.:

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**INTRODUCTION**

Plaintiff Hugues Gervat ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant QuantumScape Corporation ("QuantumScape" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Jagdeep Singh, Fritz Prinz, Timothy Holme, Kevin Hettrich, Frank Blome, Brad Buss, John Doerr, Jürgen Leohold, Justin Mirro, Dipender Saluja, and J.B. Straubel (collectively, the "Individual Defendants") and Volkswagen Group of America Investments, LLC ("VGA" and, together with the Individual Defendants and QuantumScape, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of QuantumScape, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants and Defendant VGA, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding QuantumScape, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by QuantumScape's controlling shareholder, directors, and officers between

November 27, 2020 through December 31, 2020, both dates inclusive (the "Relevant Period").

2.     QuantumScape is a Delaware corporation based in San Jose, California, that develops and sells specialized lithium-metal solid-state batteries for use in electrical vehicles. The Company, in its current form, came about as the result of a merger deal that closed on November 25, 2020 (the "Merger") between Kensington Capital Acquisition Corp. ("Kensington"), to which the Company is the successor, and a separate entity also called QuantumScape Corporation, which is now a subsidiary of the Company ("Legacy QuantumScape"). The Company's Class A common stock now trades on the New York Stock Exchange ("NYSE") under the ticker symbol "QS" with its publicly traded warrants also trading on the NYSE under the ticker symbol "QS.WS."

3.     Beginning November 27 and throughout the Relevant Period, the Individual Defendants and Defendant VGA made, or caused the Company to make, materially false and misleading statements concerning QuantumScape's business. Specifically, they made statements to the effect that the Company's battery technology was "positioned to become a leading supplier of solid-state batteries" for electric vehicles, that the Company's batteries were "designed to be safer, and to deliver greater range, faster charge times and improved cycle life" as compared to other batteries, and that the Company's batteries enjoyed "up to 80% longer range compared to today's lithium-ion batteries." Their false and misleading statements had the effect of misleading the investing public and driving up the Company's stock price in advance of the secondary public stock offering ("SPO"), beginning on December 31, 2020, in the course of which at least four and as many as eight of the Individual Defendants and Defendant VGA sold their shares at artificially inflated prices.

4.     These statements were unfounded and untrue. On January 4, 2021, *Seeking Alpha* published a report regarding the Company that stated, *inter alia*, that QuantumScape's batteries "will likely never achieve the performance they claim," that the batteries likely "will only last for 260 cycles or about 75,000 miles of aggressive driving,"

and that the batteries' "energy density [target for] 2028 will not beat today's state of the art, and will not be state of the art when it is achieved."

5.     On news of this report, the Company's share price declined by approximately 40.8%, or $34.49, from closing at $84.45 per share on December 31, 2020, the previous day of trading and the day of the SPO, to closing at $49.96 per share on January 4, 2021.

6.     During the Relevant Period, the Individual Defendants and Defendant VGA breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants and Defendant VGA willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) QuantumScape's lithium-metal solid-state batteries did not have the power, longevity, or energy density that they were being held out as having; (2) the Company did not have, and was extremely unlikely to soon develop, the ability to adapt their batteries to be readily usable in electric vehicles; (3) as a result of the foregoing, the statements complained of herein about the Company's business and prospects were materially false and misleading at the time they were made; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, QuantumScape's public statements were materially false and misleading at all relevant times.

7.     The Individual Defendants and Defendant VGA also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while at least four and as many as eight of the Individual Defendants and Defendant VGA sold shares in the SPO at inflated prices.

8.     Additionally, in breach of their fiduciary duties, the Individual Defendants and Defendant VGA caused the Company to fail to maintain adequate internal controls.

9.     In light of the Individual Defendants' and Defendant VGA's misconduct, which has subjected the Company and its Chief Executive Officer ("CEO") to three federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California (the "Securities Class Actions")—with one of the Company's directors, its Chief Technology Officer ("CTO"), its Chief Financial Officer ("CFO"), and Defendant VGA, as controlling shareholder of QuantumScape, named in one of the three Securities Class Actions—, the need to undertake intake internal investigations, the need to implement adequate internal controls, the through losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company,  and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

10.     The Company has been substantially damaged as a result of the Individual Defendants' and Defendant VGA's knowing or highly reckless breaches of fiduciary duty and other misconduct.

11.     In light of the breaches of fiduciary duty engaged in by Defendant VGA and the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the CEO's liability in the Securities Class Actions (as well as Defendant Prinz's, Holme's, Hettrich's, and VGA's liability in one of the three Securities Class Actions), of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's

claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     Venue is proper in this District because QuantumScape's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

16.     Plaintiff is a current shareholder of QuantumScape. Plaintiff has continuously held QuantumScape common stock at all relevant times.

### Nominal Defendant QuantumScape

17.     QuantumScape is a Delaware corporation with its principal executive offices at 1730 Technology Drive, San Jose, California 95110. QuantumScape's shares trade on the NYSE under the ticker symbol "QS," with its publicly traded warrants also trading on the NYSE under the ticker symbol "QS.WS." QuantumScape has two classes of common stock, Class A and Class B, with shares of Class B common stock having ten votes each to shares of Class A common stock's one.

### Defendant Singh

18.     Defendant Jagdeep Singh ("Singh") is the Company's CEO and Chairman of the Board and has served in that role since the Merger in November 2020. Prior to the Merger, he cofounded Legacy QuantumScape where he served as the CEO and as a director from May 2010 until the Merger. According to the Company's Prospectus filed with the SEC pursuant to Rule 424(b)(3) on December 31, 2020 (the "Prospectus"), as of December

Verified Shareholder Derivative Complaint

23, 2020, Defendant Singh beneficially owned 28,818,240 shares of the Company's Class A and Class B common stock, which represented 7.68% of the Company's outstanding common stock as of that date and 10.07% of the total voting power. Given that the price per share of the Company's common stock at the close of trading on December 23, 2020 was $110.79, Defendant Singh owned approximately $3.2 billion worth of QuantumScape stock.

19.    As CEO, Defendant Singh is entitled to substantial compensation from the Company for the fiscal year ended December 31, 2020.

20.    The Prospectus listed Defendant Singh as having offered up to 32,608,050[1] shares of Company Class A and Class B common stock as part of the SPO.

21.    The Prospectus stated the following about Defendant Singh:

**Jagdeep Singh** has served as our Chief Executive Officer and the Chairman of our Board since November 2020. Mr. Singh co-founded Legacy QuantumScape and has served as its Chief Executive Officer and on Legacy QuantumScape's board of directors since its incorporation in May 2010. Prior to joining Legacy QuantumScape, he was the founder and Chief Executive Officer at Infinera Corporation (NASDAQ: INFN), a telecommunications company, from 2001 to 2009. Mr. Singh holds a B.S. in Computer Science from the University of Maryland College Park, an M.B.A. from the University of California, Berkeley, Haas School of Business, and a M.S. in Computer Science from Stanford University.

We believe Mr. Singh is qualified to serve on our Board because of the perspective and experience he brings as Legacy QuantumScape's Chief Executive Officer, his leadership experience in the energy storage industry, his educational background and his strong scientific knowledge.

### Defendant Prinz

22.    Defendant Fritz Prinz ("Prinz") has served as a Company director since the Merger in November 2020. Prior to the Merger, he had served as a director on the board of

---

[1] The discrepancy between the beneficial ownership numbers for Defendant Singh, as well as other Defendants, and the number of shares they offered in the SPO represent additional options and restricted stock units which vest more than sixty days after December 23, 2020, and therefore not counted for beneficial ownership purposes.

Legacy QuantumScape since December 2010, which he cofounded. According to the Prospectus, as of December 23, 2020, Defendant Prinz beneficially owned 13,484,541 shares of the Company's Class B common stock, representing 3.70% of all outstanding common stock and 7.62% of total voting power. Given that the price per share of the Company's common stock at the close of trading on December 23, 2020 was $110.79, Defendant Prinz owned approximately $1.5 billion worth of QuantumScape stock.

23.     For the fiscal year ended December 31, 2020, Defendant Prinz is entitled to significant compensation from the Company as a director.

24.     The Prospectus listed Defendant Prinz as offering up to 13,484,451 shares of Company Class B stock in the SPO.

25.     The Prospectus stated the following about Defendant Prinz:

**Prof. Fritz Prinz** has served on our Board since November 2020, and on Legacy QuantumScape's board of directors since December 2010. Prof. Prinz has served as Professor of Materials Science and Engineering, Professor of Mechanical Engineering, and Senior Fellow at the Precourt Institute for Energy since September 2010. He has also served as the Finmeccanica Professor at the School of Engineering at Stanford University since September 1994. Prof. Prinz holds a Ph.D. in Physics and Mathematics from the University of Vienna, Austria.

We believe Prof. Prinz is qualified to serve on our Board because of his in-depth educational expertise and his broad insight and research into energy conservation.

**Defendant Holme**

26.     Defendant Timothy Holme ("Holme") has served as the Company's CTO since the Merger in November 2020. Prior to the Merger, he had served as CTO at Legacy QuantumScape since January 2011, which he cofounded. According to the Prospectus, as of December 23, 2020, Defendant Holme beneficially owned 14,859,424 shares of Company Class A and Class B common stock, representing 4.07% of the Company's outstanding common stock and 7.85% of total voting power. Given that the price per share

of the Company's common stock at the close of trading on December 31, 2020 was $110.79, Defendant Holme owned over $1.6 billion worth of QuantumScape stock.

27.     For the fiscal year ended December 31, 2020, Defendant Holme is entitled to receive substantial compensation from the Company as CTO.

28.     The Prospectus listed Defendant Holme as offering up to 15,222,385 shares of Company Class A and Class B common stock in the SPO.

29.     The Prospectus stated the following about Defendant Holme:

**Dr. Timothy Holme** has served as our Chief Technology Officer since November 2020. Dr. Holme served as Legacy QuantumScape's Chief Technology Officer from January 2011 to November 2020. Prior to joining Legacy QuantumScape, he was a Research Associate at Stanford University from June 2008 to January 2011. Dr. Holme holds a B.S. in Physics, a M.S. in Mechanical Engineering, and a Ph.D. in Mechanical Engineering from Stanford University.

**Defendant Hettrich**

30.     Defendant Kevin Hettrich ("Hettrich") has served as the Company's CFO since the Merger in November 2020. Prior to the Merger, he had served as the CFO at Legacy QuantumScape since September 2018, and prior to that he had served in various executive and management positions at Legacy QuantumScape since January 2012. According to the Prospectus, as of December 23, 2020, Defendant Hettrich beneficially owned 2,594,023 shares of the Company's common stock. Given that the price per share of the Company's Class A and Class B common stock at the close of trading on December 23, 2020 was $110.79, Defendant Hettrich owned over $287 million worth of QuantumScape stock.

31.     Defendant Hettrich is entitled to substantial compensation for the fiscal year ended December 31, 2020 as CFO of the Company.

32.     The Prospectus listed Defendant Hettrich as having offered up to 2,594,023 shares of Company Class A and Class B common stock as part of the SPO.

33.     The Prospectus stated the following about Defendant Hettrich:

**Kevin Hettrich** has served as our Chief Financial Officer since November 2020. Mr. Hettrich served as Legacy QuantumScape's Chief Financial Officer and head of Business Operations from September 2018 to November 2020. Prior to this, Mr. Hettrich served as Legacy QuantumScape's Vice President of Business Operations from March 2016 to March 2018, as Senior Director of Finance and Product Management from March 2014 to March 2016, as a Director of Product Management from March 2013 to March 2014, and as a Manager of Product Management from January 2012 to March 2013. Prior to joining Legacy QuantumScape, Mr. Hettrich served as a Private Equity Associate of Bain Capital, an investment firm, from September 2007 to July 2009. Mr. Hettrich also served as a Business Analyst at McKinsey & Company, a management consulting firm, from September 2004 to July 2007. Mr. Hettrich holds a B.A. in Economics from Pomona College, a M.B.A. from Stanford Graduate School of Business, and a M.S. in Environment and Resources from Stanford University.

### Defendant Blome

34.     Defendant Frank Blome ("Blome") has served as a Company director since the Merger in November 2020. He also serves as a member of the Company's Nominating and Corporate Governance Committee. Prior to the Merger, he had served as a director on the board of Legacy QuantumScape since September 2020. In addition, Defendant Blome also serves as the Head of the  Battery Center of Excellence at Volkswagen Aktiengesellschaft ("Volkswagen") and, as such, is an affiliate of VGA, which is a Volkswagen subsidiary.

35.     For the fiscal year ended December 31, 2020, Defendant Blome is entitled to significant compensation from the Company as a director.

36.     The Prospectus stated the following about Defendant Blome:

**Frank Blome** has served on our Board since November 2020, and on Legacy QuantumScape's board of directors since September 2020. Mr. Blome has also served on the board of QSV Operations LLC since September 2020. Mr. Blome has 25 years of professional experience in the automotive industry, with a particular focus on alternative powertrain technologies and battery cell technology. Since January 2018, Mr. Blome has served as the Head of the Battery Center of Excellence of Volkswagen AG. Prior to this, Mr. Blome served from May 2016 to June 2016 as Chief Executive Officer at Mercedes-Benz Energy GmbH, a subsidiary of the Daimler Group active in the EV

battery storage space. From July 2013 to June 2017, Mr. Blome served as Chief Executive Officer of LiTec Battery GmbH, a battery cell manufacturing company started as a joint venture between Daimler Group and Evonik Industries AG, a specialty chemicals company. In addition to these roles, Mr. Blome served from June 2009 to June 2017 as the Chief Executive Officer of Deutsche Accumotive GmbH & Co KG, a subsidiary of Daimler Group, producing batteries for hybrid and EVs, after which Mr. Blome was on garden leave until January 2018 when he started in his current position at Volkswagen. Mr. Blome holds a diploma in electrical engineering from the University of Applied Sciences Bielefeld.

We believe Mr. Blome is qualified to serve on our Board due to his vast experience in the automotive and alternative powertrain industries.

**Defendant Buss**

37.    Defendant Brad Buss ("Buss") has served as a Company director since the Merger in November 2020. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee. Prior to the Merger, he had served as a director on the board of Legacy QuantumScape since August 2020. According to the Prospectus, as of December 23, 2020, Defendant Buss beneficially owned 304,426 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on December 31, 2020 was $110.79, Defendant Buss owned over $33.7 million worth of QuantumScape stock.

38.    For the fiscal year ended December 31, 2020, Defendant Buss is entitled to significant compensation for his services as a director at the Company.

39.    The Prospectus listed Defendant Buss as offering up to 1,712,038 shares of the Company's Class A common stock in the SPO.

40.    The Prospectus stated the following about Defendant Buss:

**Brad Buss** has served on our Board since November 2020, and on Legacy QuantumScape's board of directors since August 2020. From August 2014 until his retirement in February 2016, Mr. Buss served as the Executive Vice President and Chief Financial Officer of SolarCity Corporation, a solar energy company acquired by Tesla, Inc. (NASDAQ: TSLA), a high-performance electric vehicle company. Mr. Buss also served as the Executive, Vice President and Chief Financial Officer of Cypress Semiconductor Corporation

(NASDAQ: CY), a semiconductor design and manufacturing company, from August 2005 to June 2014. Mr. Buss has served on the boards of Advance Auto Parts, Inc. (NYSE: AAP) ("Advance"), an automotive parts and accessories provider, since March 2016, Marvell Technology Group Ltd. (NASDAQ: MRVL) ("Marvell"), a semiconductor company, since July 2018, and AECOM (NYSE: ACM), an engineering firm, since August 2020. Mr. Buss serves as Chair of the Audit Committee of Advance, Chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee of Marvell, and a member of the Nominating and Governance Committee and Compensation and Organization Committee of AECOM. Mr. Buss previously served on the boards of Tesla, Inc. from November 2009 to June 2019, Cavium, Inc., a semiconductor company, from July 2016 until its acquisition by Marvell in July 2018, and CafePress Inc., an e-commerce company, from October 2007 to July 2016. He served on the Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee, and Disclosure Committee of Tesla, the Audit Committee and Compensation Committee of Cavium, Inc., and the Audit Committee and Compensation Committee of CafePress Inc. Mr. Buss holds a B.A. in Economics from McMaster University and a Honors Business Administration degree from University of Windsor.

We believe Mr. Buss is qualified to serve on our Board because of his vast leadership expertise and experience on the boards of major automotive companies.

**Defendant Doerr**

41.    Defendant John Doerr ("Doerr") has served as a Company director since the Merger in November 2020. He also serves as a member of the Nominating and Corporate Governance Committee. Prior to the Merger, he had served as a director on the board of Legacy QuantumScape since December 2010.

42.    For the fiscal year ended December 31, 2020, Defendant Doerr is entitled to significant compensation for his role as a director at the Company.

43.    The Prospectus stated the following about Defendant Doerr:

**John Doerr** has served on our Board since November 2020, and on Legacy QuantumScape's board of directors since December 2010. Mr. Doerr currently serves as Chairman at Kleiner Perkins, a venture capital firm, and previously served as a Partner from August 1980 to March 2016. Mr. Doerr currently serves on the boards of Amyris, Inc. (NASDAQ: AMRS), a

Verified Shareholder Derivative Complaint

biotechnology company, since May 2006, Bloom Energy Corporation (NYSE: BE), an energy solutions company, since April 2002, and Alphabet, Inc. (NASDAQ: GOOGL), a multinational technology company, since May 1999. He serves as Chair of the Nominating and Corporate Governance Committee of Amyris, Inc., a member of the Compensation and Organizational Development Committee of Bloom Energy Corporation, and Chair of the Leadership Development and Compensation Committee of Alphabet, Inc. Mr [sic] Doerr previously served on the boards of Zynga, Inc. (NASDAQ: ZNGA), a social game developer, from March 2013 to May 2017, and Amazon.com, Inc. (NASDAQ: AMZN), a multinational technology company, from June 1996 to May 2010. Mr. Doerr holds a B.S. and an M.E.E. in Electrical Engineering from Rice University and an M.B.A. from Harvard Business School.

We believe Mr. Doerr is qualified to serve on our Board because of his extensive investment experience in the technology industry and extensive expertise and skills in strategy, finance and management.

### **Defendant Leohold**

44.     Defendant Jürgen Leohold ("Leohold") has served as a Company director since the Merger in November 2020. He also serves as Chair of the Compensation Committee. Prior to the Merger, he had served as a director on the board of Legacy QuantumScape since May 2015. In addition, he served in various leadership positions including at Volkswagen from April 2006 until May 2019. According to the Prospectus, as of December 23, 2020, Defendant Leohold beneficially owned 341,858 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on December 23, 2020 was $110.79, Defendant Leohold owned approximately $37.9 million worth of QuantumScape stock.

45.     For the fiscal year ended December 31, 2020, Defendant Leohold is entitled to significant compensation for his role as a director at the Company.

46.     According to the Prospectus, Defendant Leohold offered up to 804,350 shares of Company's Class A stock in the SPO.

47.     The Prospectus stated the following about Defendant Leohold:

Verified Shareholder Derivative Complaint

**Prof. Dr. Jürgen Leohold** has served on our Board since November 2020, and on Legacy QuantumScape's board of directors since May 2015. From October 2012 to December 2017, Prof. Dr. Leohold served as the Head of the Volkswagen AutoUni, an advanced training and research institution for Volkswagen Aktiengesellschaft, a German automobile manufacturer. He continued to serve as a consultant for Volkswagen AutoUni's research and development group from January 2018 until retiring in May 2019. He also served as the Executive Director of Group Research at Volkswagen Aktiengesellschaft from April 2006 to July 2016. Prof. Dr. Leohold holds a degree in Electrical Engineering from the University of Hannover, a M.S. in Electrical Engineering from the Georgia Institute of Technology and a doctoral degree from the University of Hannover.

We believe Prof. Dr. Leohold is qualified to serve on our Board because of his leadership experience and his expertise in the energy technology and automotive fields.

**Defendant Mirro**

48.     Defendant Justin Mirro ("Mirro") has served as a Company director since the Merger in November 2020. He also serves as Lead Independent Director, as the Chair of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee. Prior to the Merger, Defendant Mirro served as the Chairman and CEO of the Company's predecessor, Kensington, from April 2020 until November 2020. According to the Prospectus, as of December 23, 2020, Defendant Mirro beneficially owned 1,744,898 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on December 23, 2020 was $110.79, Defendant Mirro owned over $193.3 million worth of QuantumScape stock.

49.     For the fiscal year ended December 31, 2020, Defendant Mirro is entitled to substantial compensation as a director at the Company.

50.     The Prospectus listed Defendant Mirro as offering up to 1,744,898 shares of Class A common stock and 879,357 warrants for Class A common stock as part of the SPO.

51.     The Prospectus stated the following about Defendant Mirro:

**Justin Mirro** has served on our Board since November 2020, and as Kensington's Chairman and Chief Executive Officer from April 2020 to November 2020. Mr. Mirro has over 25 years of operating, mergers and acquisitions and financing experience in the automotive and automotive-related sector. He began his career at General Motors Company ("GM") as a Tool and Die Manufacturing Engineer, with successive positions at Car and Driver Magazine, Toyota Motor Corporation and Itochu International Inc. prior to transitioning to automotive investment banking at Schroder & Co. Inc./Salomon Smith Barney, Inc./ABN Amro Inc. in 1996. In 1999, Mr. Mirro formed Kensington Capital Partners, LLC, where he has served as President since 2015, to invest in automotive and automotive-related sector businesses. In 2005, Mr. Mirro transitioned to Jefferies & Company, Inc. as Head of Automotive Investment Banking, and later served as the Head of Automotive Investment Banking at Moelis & Company, LLC ("Moelis") and RBC Capital Markets, LLC ("RBC Capital Markets") from 2008 to 2011 and 2011 to 2014, respectively. In his role, Mr. Mirro played a key role in leading and executing all aspects of capital raising, mergers and acquisitions and restructurings, and has advised on over 70 transactions totaling more than $60 billion of value for OEMs, suppliers and automotive-related industries. From 2016 to 2019, Mr. Mirro served as Chairman of the board of directors and audit committee of Pure Power Technologies, Inc. ("Pure Power") one of the largest aftermarket suppliers of diesel fuel injectors, which was later sold to Stanadyne LLC ("Stanadyne"). In his role, Mr. Mirro focused on deal sourcing, structuring, capital raising, executive recruitment and the eventual sale process. Mr. Mirro has sat on the boards of Cooper-Standard Holdings Inc. ("Cooper-Standard Holdings") and Transtar Industries, Inc., since 2015 and 2017, respectively, where he has focused on mergers and acquisitions, capital structuring and public market strategy.

We believe Mr. Mirro is qualified to serve on our Board due to his experience serving as Kensington's Chairman and Chief Executive Officer, as well as his extensive skills in strategy, finance and management.

**Defendant Saluja**

52.     Defendant Dipender Saluja ("Saluja") has served as a Company director since the Merger in November 2020. He also serves as a member of the Audit Committee. Prior to the Merger, he had served as a director on the board of Legacy QuantumScape since August 2012.

53.    For the fiscal year ended December 31, 2020, Defendant Saluja is entitled to significant compensation as a director at the Company.

54.    The Prospectus stated the following about Defendant Saluja:

**Dipender Saluja** has served on our Board since November 2020, and on Legacy QuantumScape's board of directors since August 2012. Mr. Saluja has served as Managing Director of Capricorn Investment Group, an investment firm, since 2006. Prior to Capricorn Investment Group, he served in various positions from 1990 to 2006 at Cadence Design Systems, an electronic design company. Mr. Saluja also currently serves as a Commissioner of the Global Commission to End Energy Poverty, a non-profit organization dedicated to providing electricity services to under-served communities, and also on the boards of several private companies.

We believe Mr. Saluja is qualified to serve on our Board because of his extensive investment experience in the technology industry and extensive expertise and skills in strategy, finance and management.

**Defendant Straubel**

55.    Defendant J.B. Straubel ("Straubel") has served as a Company director since the Merger in November 2020. He also serves as a member of the Compensation Committee. Prior to the Merger, he had served as a director on the board of Legacy QuantumScape since December 2019. According to the Prospectus, as of December 23, 2020, Defendant Straubel beneficially owned 636,772 shares of the Company's Class A and Class B common stock. Given that the price per share of the Company's common stock at the close of trading on December 23, 2020 was $110.79, Defendant Straubel owned over $70.5 million worth of QuantumScape stock.

56.    For the fiscal year ended December 31, 2020, Defendant Straubel is entitled to significant compensation for his role as a director at the Company.

57.    According to the Prospectus, Defendant Straubel offered up to 1,407,611 shares of Company Class A and Class B common stock in the SPO.

58.    The Prospectus stated the following about Defendant Straubel:

**J.B. Straubel** has served on our Board since November 2020, and on Legacy QuantumScape's board of directors since December 2019. Mr. Straubel has

served as the Founder and Chief Executive Officer of Redwood Materials Inc., an electronic recycling and development company, since May 2017. Prior to joining Legacy QuantumScape, Mr. Straubel also co-founded and served as the Chief Technology Officer of Tesla, Inc. from May 2005 to July 2019. Mr. Straubel previously served on the board of SolarCity Corporation and as a member of its Nominating and Corporate Governance Committee from August 2006 until its acquisition by Tesla, Inc. in November 2016. Mr. Straubel holds a B.S. in Energy Systems Engineering and a M.S. in Engineering, with an emphasis on energy conversion, from Stanford University.

We believe Mr. Straubel is qualified to serve on our Board because of his technical and manufacturing expertise along with his leadership experience in electronic companies.

**Defendant VGA**

59.     Defendant VGA is a Delaware limited liability company based in Herndon, Virginia. It is a Volkswagen subsidiary. According to the Prospectus, as of December 23, 2020, Defendant VGA beneficially owned 70,995,205 shares of the Company's Class A and Class B common stock, representing 19.51% of the Company's outstanding Common Stock and 13.15% of total voting power, making  VGA a controlling shareholder of QuantumScape as of that date. Moreover, VGA exercised the power to nominate two directors to the Company's Board, Defendant Blome, who the Company admits is a VGA affiliate through his employment with Volkswagen, and nonparty Wiese, who joined the Board in January 2021 and is also affiliated with VGA through his employment with Volkswagen.

60.     According to the Prospectus, VGA offered up to 70,995,205 shares of the Company's Class A and Class B common stock in the SPO.

61.     The Prospectus stated the following about the Company's relationship with VGA and with Volkswagen, in relevant part:

> *Concentration of ownership among Volkswagen and our executive officers, directors and their affiliates may prevent new investors from influencing significant corporate decisions.*

As of December 23, 2020, Volkswagen beneficially owns approximately 25.53% of the Class A Common Stock and 11.51% of Class B Common Stock outstanding, representing 13.15% of the vote, and our executive officers, directors and their affiliates as a group beneficially own approximately 39.49% of Class A Common Stock and 61.52% Class B Common Stock outstanding, representing 58.79% of the vote. As a result, these stockholders will be able to exercise a significant level of control over all matters requiring stockholder approval, including the election of directors, any amendment of our amended and restated certificate of incorporation (the "Certificate of Incorporation") and approval of significant corporate transactions. In addition, Volkswagen holds the right to designate two directors to our board of directors (our "Board"). This control could have the effect of delaying or preventing a change of control of or changes in our management and will make the approval of certain transactions difficult or impossible without the support of these stockholders and of their votes.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS AND DEFENDANT VGA

62.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of QuantumScape and because of their ability to control the business and corporate affairs of QuantumScape, the Individual Defendants and Defendant VGA owed QuantumScape and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage QuantumScape in a fair, just, honest, and equitable manner. The Individual Defendants and Defendant VGA were and are required to act in furtherance of the best interests of QuantumScape and its shareholders so as to benefit all shareholders equally.

63.     Each controlling shareholder, director, and officer of the Company owes to QuantumScape and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

64.     The Individual Defendants and Defendant VGA, because of their positions of control and authority as controlling shareholder, directors, and/or officers of

QuantumScape, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

65.    To discharge their duties, the controlling shareholder, officers, and directors of QuantumScape were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

66.    Each Individual Defendant and Defendant VGA, by virtue of his or its position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants and Defendant VGA complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of QuantumScape, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants and Defendant VGA were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised QuantumScape's Board at all relevant times.

67.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to

disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

68.     To discharge their duties, the officers and directors of QuantumScape were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of QuantumScape were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to QuantumScape's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how QuantumScape conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of QuantumScape and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that QuantumScape's operations would comply with all applicable laws and QuantumScape's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

69.     Each of the Individual Defendants and Defendant VGA further owed to QuantumScape and the shareholders the duty of loyalty requiring that each favor QuantumScape's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

70.     At all times relevant hereto, the Individual Defendants were the agents of each other and of QuantumScape and were at all times acting within the course and scope of such agency.

71.     Because of their advisory, executive, managerial, directorial, and controlling positions with QuantumScape, each of the Individual Defendants and Defendant VGA had access to adverse, nonpublic information about the Company.

72.     The Individual Defendants and Defendant VGA, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by QuantumScape.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

73.     In committing the wrongful acts alleged herein, the Individual Defendants and Defendant VGA have pursued, or joined in the pursuit of, a common course of conduct,

and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants and Defendant VGA caused the Company to conceal the true facts as alleged herein. The Individual Defendants and Defendant VGA further aided and abetted and/or assisted each other in breaching their respective duties.

74.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' and Defendant VGA's violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

75.     The Individual Defendants and Defendant VGA accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants and Defendant VGA collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of QuantumScape was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

76.     Each of the Individual Defendants and Defendant VGA aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants and Defendant VGA acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

77.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of QuantumScape, and was at all times acting within the course and scope of such agency.

## QUANTUMSCAPE'S CODE OF CONDUCT AND GOVERNANCE

### *QuantumScape's Code of Conduct*

78.    In a section titled, "Purpose," the Company's Code of Conduct states that it "applies to all directors, officers and employees … of the Company, as well as Company contractors, consultants and agents." The Code of Conduct further states that it "serves as a guide" and that the Company "expects employees to use good judgment" and "adhere to the high ethical standards to which the Company is committed."

79.    The section titled, "Purpose," of the Company's Code of Conduct also states that it is designed to "deter wrongdoing" and to promote:

1.  *fair and accurate financial reporting*;

2.  *compliance with applicable laws, rules and regulations including*, without limitation, full, fair, accurate, timely and understandable disclosure in *reports and documents that [the Company] files with, or submit to, the U.S. Securities and Exchange Commission* and in the Company's other public communications;

3.  the prompt *internal reporting of violations of this Code* as set forth in this Code;

4.  *honest and ethical conduct*, including the ethical handling of actual or apparent conflicts of interest; and

5.  *a culture of honesty and accountability*.

(Emphasis added.)

80.    Moreover, under the section titled, "Financial Reports and Other Records – Disclosure," the Code of Conduct states, in relevant part, that:

Employees are responsible for the accurate and complete reporting of financial information within their respective areas and for the timely notification to senior management of financial and non-financial information

that may be material to the Company to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with government agencies or releases to the general public.

Each employee involved in the Company's disclosure process must familiarize themselves with the disclosure requirements applicable to the Company and the business and financial operations of the Company, and must not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations.

Employees must maintain all of the Company's books, records, accounts and financial statements in reasonable detail, and reflect the matters to which they relate accurately, fairly and completely. Furthermore, employees must ensure that all books, records, accounts and financial statements conform both to applicable legal requirements and to the Company's system of internal controls….

81.   In a section titled, "Conflicts of Interest," the Code of Conduct provides, in relevant part, that directors, officers, and employees "must act and behave in the Company's best interests and not based on personal relationships or benefits. You should avoid situations where your personal activities and relationships conflict, or appear to conflict, with the Company's interests."

82.   In a section titled, "Compliance with Laws, Rules and Regulations," the Code of Conduct states, in relevant part:

All employees must respect and obey all laws when carrying out responsibilities on behalf of the Company and refrain from illegal conduct.

Employees have an obligation to be knowledgeable about specific laws, rules and regulations that apply to their areas of responsibility….

\* \* \*

Insider Trading. Under federal and state securities laws, it is illegal to trade in the securities of a company while in possession of material non-public information about that company. Because employees will have knowledge of specific confidential information that is not disclosed outside the Company

which will constitute material nonpublic information, trading in the Company's securities or in the securities of those companies with which the Company does business by employees or persons employees provide material nonpublic information to could constitute insider trading, violating the law. It is an employee's responsibility to comply with these laws and not to share material nonpublic information.

\* \* \*

Keeping the Audit Committee Informed. The Audit Committee of the Board (the "Audit Committee") plays an important role in ensuring the integrity of the Company's public reports. If an employee believes that questionable accounting or auditing conduct or practices have occurred or are occurring, they should notify the Audit Committee. In particular, any employee should promptly bring to the attention of the Audit Committee any information of which they may become aware concerning:

    a.  the accuracy of material disclosures made by the Company in its public filings;

    b.  material weaknesses or significant deficiencies in internal control over financial reporting;

    c.  any evidence of fraud that involves an employee who has a significant role in the Company's financial reporting, disclosures or internal controls or procedures; or

    d.  any evidence of a material violation of the policies in this Code regarding financial reporting.

Maintaining and Managing Records. The Company is required by local, state, federal, foreign and other applicable laws, rules and regulations to retain certain records and to follow specific guidelines in managing its records. Records include all recorded information, regardless of medium or characteristics. Civil and criminal penalties for failure to comply with such guidelines can be severe for employees, agents, contractors and the Company.

83.    The Code of Conduct further provides, in a section titled, "Compliance and Reporting," that, in relevant part: "If an employee knows of or suspects a violation of

this Code, or of applicable laws and regulations (including complaints or concerns about accounting, internal accounting controls or auditing matters), or an employee has concerns about a situation that they believe does not reflect the Company's culture and values, the employee must report it immediately to their manager, the Compliance Officer or Human Resources."

84.    The Code of Conduct further requires that all employees, which the Code defines as including directors and officers, to sign an acknowledgement, *inter alia*, that they "have received and read" the Code, that they "acknowledge" and "understand" the Code, that they "agree to comply with the Code."

### *Audit Committee Charter*

85.    The Audit Committee Charters states that:
The purpose of the Committee is to assist the Board in its oversight of:

1.    the accounting and financial reporting processes and internal controls of the Company;

2.    the audit and integrity of the Company's financial statements;

3.    the Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements);

4.    the qualifications, independence and performance of the Company's independent auditors; and

5.    the design, implementation and performance of the Company's internal audit function, if applicable.

The Committee shall also be responsible for preparing the report required by the U.S. Securities and Exchange Commission (the "SEC") rules to be included in the Company's proxy statement for the annual meeting of stockholders, and for performing other duties and responsibilities as are enumerated in or consistent with this charter.

86.    The Audit Committee Charter, in relevant part, under "Responsibilities," further states:

Review of Internal Controls and Integrity of Financial Statements. The Committee shall meet with management, the internal audit department, if applicable, and the Company's independent auditor to review and discuss the Company's internal controls and the integrity of the Company's audited financial statements. Included in this process shall be review of:

a.      the scope and timing of the annual audit of the Company's financial statements;

b.      the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and Form 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations"; the Committee shall make a recommendation to the Board as to whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K for filing with the SEC;

c.      the results of the independent audit and the quarterly reviews, and the independent auditor's opinion on the audited financial statements;

d.      the quality and adequacy of the Company's internal controls, and discussion with management and the independent auditor with regard to any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's internal controls;

e.      the Company's disclosure controls and procedures, as well as the quarterly assessments of such controls and procedures by the Chief Executive Officer and Chief Financial Officer;

f.      any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

g.      any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

h.    the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and

i.    any audit problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management.

87.    In addition, under the "Compliance with Laws," section, the Audit Committee Charter states that "[t]he Committee must discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any reports or complaints that raise material issues regarding the Company's financial statements or policies. The Committee must discuss with the Company's Chief Legal Officer any legal matters that may have a material impact on the financial statements or the Company's compliance procedures."

88.    Moreover, under "Enterprise Risk Management," Audit Committee Charter states that:

> The Committee shall review and discuss with management, including the Company's internal audit function, if applicable, and the Company's independent auditor guidelines and policies to identify, monitor, and address enterprise risks. This shall include discussion of the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures. The Committee shall also oversee and monitor management's plans to address such risks. In connection with its review of enterprise risk, management's assessment thereof and any draft risk factors presented by management, the Committee is entitled to rely on management's identification and assessment of the operational, financial, strategic, regulatory and other risks described.

### *Compensation Committee Charter*

89.    The Compensation Committee Charter states that:

The purposes of the Committee shall be to:

1. oversee the Company's compensation policies, plans, benefits programs, and overall compensation philosophy;

2. assist the Board in discharging its responsibilities relating to (a) overseeing compensation of the Company's Chief Executive Officer ("CEO") and other individuals who are "officers" as defined in Rule 16a-1(f) (all such officers, the "Executive Officers") under the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), and (b) evaluating and recommending the Executive Officer compensation plans, policies and programs of the Company;

3. administer the Company's incentive compensation plans, equity compensation plans, and such other plans as designated from time to time by the Board; and

4. prepare the report of the Committee required by the rules and regulations of the U.S. Securities and Exchange Commission (the "SEC").

The Committee shall seek to structure the Company's compensation plans, policies and programs in order to attract and retain the best available personnel for positions of substantial responsibility with the Company, provide incentives for such persons to perform to the best of their abilities for the Company, maintain appropriate levels of risk and reward and promote the success of the Company's business.

90.     Furthermore, under the section titled "Responsibilities," the Compensation Committee Charter notes the following, in relevant part:

Executive Compensation. The Committee shall have direct responsibility to:

a. review and approve annually the corporate goals and objectives applicable to the compensation of the CEO, evaluate at least annually the CEO's performance in light thereof, and consider factors related to the performance of the Company in approving the compensation level of the CEO;

b. review at least annually and approve or recommend for approval to the Board members other than the CEO, the CEO's (i) base salary, (ii) incentive bonus, including the specific goals and amount, (iii) equity compensation, (iv) any employment agreement, severance arrangement, transition or consulting agreement, retirement agreement or change of control protections and (v) any other benefits, compensation or similar arrangements, if any (including, without limitation, perquisites and any other form of compensation such as a signing bonus or payment of relocation costs), including any amendments to or terminations of any of the foregoing;

c. in consultation with the CEO, review at least annually and approve or recommend for approval to the Board members other than the CEO items (i) through (v) for the other Executive Officers, including any prospective or former Executive Officers, including any amendments to or terminations of any of the foregoing;

d. review and approve, as well as approve amendments to or terminations of, any compensatory contracts or similar transactions or arrangements with such other employees as the Committee determines, including employment agreements, severance arrangements, transition or consulting agreements, retirement agreements and change-in-control agreements or provisions.

91.     The Individual Defendants violated the Code of Conduct, Company policy, and the Company's corporate governance documents by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings and by facilitating and disguising the Individual Defendants' and Defendant VGA's violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, abuse of control, gross mismanagement, and failing to report the same. Moreover, at least four and as many as eight of the Individual Defendants violated the Code of Conduct by selling Company shares at inflated prices. Further, in violation of the Code of Conduct and the Audit Committee Charter, the Individual Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with laws and regulations.

## INDIVIDUAL DEFENDANTS' AND DEFENDANT VGA'S MISCONDUCT

### Background

92.     QuantumScape is a Delaware corporation based in San Jose, California, that develops and sells specialized lithium-metal solid-state batteries for use in electrical vehicles. The Company, in its current form, came about as the result of a merger deal between Kensington, to which the Company is the successor, and a separate entity, Legacy QuantumScape, which is now a subsidiary of the Company.

Verified Shareholder Derivative Complaint

93.    Starting in 2012 and continuing through at least June 2020, VGA made a series of investments in Legacy QuantumScape that eventually led to its being a controlling shareholder in Legacy QuantumScape. VGA, and its parent company Volkswagen, were interested in investing in Legacy QuantumScape so as to have a stake in and future access to cutting edge batteries for potential use in Volkswagen electric vehicles. To this end, Volkswagen, VGA, and Legacy QuantumScape executed a joint venture agreement in 2018 for the purposes of establishing a U.S.-based manufacturing facility to produce the "pilot line" of batteries. To date, the joint venture "has had minimal operations."

94.    On September 3, 2020, Legacy QuantumScape and Kensington announced the Merger, under which the Company would receive even more funding from VGA as well as other sources. On November 27, 2020, the merger deal was completed and QuantumScape common stock and warrants began trading on the NYSE.

95.    On December 17, 2020, the Company filed a registration statement on Form S-1 with the SEC (the "Registration Statement"), which was registering 305,114,065 shares of Company Class A common stock for resale in addition to 6,650,00 warrants for additional Company Class A common stock. Following amendments, by the time the Registration Statement was declared effective on December 31, 2020, this eventually grew to 306,053,642 shares of Class A common stock, with the warrants unchanged at 6,650,000. Among these shares being registered for resale were the shares, described herein, owned by Defendants Singh, Prinz, Holme, Hettrich, Buss, Leohold, Mirro, Straubel, and VGA.

***Individual Defendants Begin to Issue Statements to Artificially Inflate QuantumScape's Valuation Prior to Merger***

96.    On September 3, 2020, Legacy QuantumScape and Kensington, the Company's predecessor, issued a joint press release which announced the forthcoming merger and creation of the Company. The press release described how "[i]n the decade

since the company was founded, [Legacy] QuantumScape has been exclusively focused on developing solid-state batteries and designing a scalable manufacturing process to commercialize its battery technology for the automotive industry." In addition, the press release asserted that Legacy "QuantumScape believes the proceeds from this transaction will fully fund the company through the start of production via its joint venture with the Volkswagen Group." Adding to this, the press release touted the characteristics of Legacy QuantumScape's, and later the Company's, batteries.

97.   Defendant Singh was quoted in the press release, stating:

> **Today marks an important milestone of advancing QuantumScape's effort in developing the next generation of solid-state batteries** to meet the needs of all future electric vehicles as the world transitions to zero emissions. Ten years ago, we embarked upon an ambitious goal that most thought was impossible. Through the tireless work of QuantumScape's more than 200 scientists and engineers, and our partnership with Volkswagen since 2012, *we have developed a new battery technology that is unlike anything else in the world.* We are now excited to partner with Kensington's unique team of world-class automotive executives, who share our vision of a cleaner and safer future powered by QuantumScape. This vote of confidence from investors, and the capital provided by this transaction, will drive a more sustainable future for generations to come.
>
> * * *
>
> **The merger** with Kensington and associated PIPE transaction **allows us to fund our business plans to first production**.
>
> * * *
>
> **We look forward to executing on continued product development and validation through to first revenue** and what we believe will be significant growth thereafter.

(Emphasis added.)

98.   Defendant Mirro was quoted in the press release, stating:

We are extremely excited and honored to partner with QuantumScape, as *this represents a unique opportunity to invest in a pure-play battery company that is positioned to transform the auto industry.* Kensington considered hundreds of automotive companies and *QuantumScape stands out as the leading company to play a pivotal role in the advancement of electric vehicles.* Through the vision and leadership of Jagdeep Singh, *QuantumScape has created a world-class team that is developing the next generation of solid-state batteries that will achieve the future performance requirements of leading vehicle manufacturers.* By combining QuantumScape with Kensington's deep industry expertise and capital from this transaction, we are confident that QuantumScape's investment thesis has been significantly enhanced.

(Emphasis added.)

99.   Defendant Straubel was quoted in the press release, stating:

*QuantumScape's solid-state anode-less design represents the most elegant architecture I've seen for a lithium-based battery system, and the company has an opportunity to redefine the battery landscape.*

(Emphasis added.)

100.   Vinod Khosla, who was a director of board member of Legacy QuantumScape at the time, was quoted in the press release, stating:

When we backed QuantumScape ten years ago, we knew it was a bold vision to transform one of the world's largest industries. We are therefore thrilled that *the team has developed technology that addresses the single largest cost component and deficiency of electric cars, the battery. By enabling greater range and much faster charge times, we believe QuantumScape's technology will assist EVs in becoming significantly more competitive with traditional internal combustion engine vehicles, paving the way for greater adoption and a greener future.*

(Emphasis added.)

101.   Legacy QuantumScape and Kensington held a joint conference call later that day, September 3, 2020, on which Defendant Mirro, then the Chairman and CEO of Kingston, further stated, in relevant part:

In our view, the single greatest mega-trend and structural paradigm shift in the automotive industry today is the advancement of electric mobility. Many global automobile manufacturers are accelerating their transition to electric

vehicles, as reflected by the hundreds of billions of dollars expected to be invested into this sector over the next five years. *Through the vision and leadership of founder and CEO Jagdeep Singh, [Legacy] QuantumScape is developing the next generation of solid-state lithium-metal batteries for use in these vehicles.* In doing so, *[Legacy] QuantumScape is redefining the frontier of battery technology, and positioning the company to play a pivotal role in the electrification of the global automotive fleet.*

Kensington is an automotive-focused SPAC with more than 300 combined years of automotive experience leading some of the largest automobile manufacturers and suppliers in the world. *It is with this significant expertise that we underwent an extensive due diligence process to identify the best long-term investment for Kensington's shareholders.* Our search involved hundreds of prospects, and after several rounds of narrowing our focus on investment opportunities, [Legacy] QuantumScape emerged as the most attractive partner for us and a company that we firmly believe *will shape the future of the auto industry*.

*Our process involved reviewing the technical, commercial, and financial results of [Legacy] QuantumScape and then using global automotive standards to validate the company's business plan.*

(Emphasis added.)

102.   Defendant Singh, later on the same call, continued:

I know I speak on behalf of the entire [Legacy] QuantumScape team when I say that I am delighted to announce this transaction with Kensington that we expect will allow us to commercially deploy our disruptive battery technology for the benefit of many around the world.

We believe that a once-in-a-century event is in the early days of unfolding with the electrification of the automotive industry. Today, just 2% of all vehicles sold are electric. If electrification of the automotive powertrain were to reach its full potential, we see a battery industry that can generate hundreds of billions of dollars of revenue per year for the next several decades. Further, our business is at the core of sustainability and addresses key ESG attributes that are so critical to so many, as our technology enables a reduction in global $CO_2$ emissions, is designed around abundant resources, and enables clean energy sources.

*To further evolve the global electric vehicle landscape, we see the availability of a better battery as mission critical. At [Legacy]*

*QuantumScape, we believe we have developed the key enabling technology that will propel this generational shift towards its full potential. We have developed a proprietary solid-state separator, which forms the heart of a solid-state battery, to construct our solid-state cells. Over the past decade, my team and I have focused exclusively on identifying and engineering the right materials to develop this technology and position us to achieve successful commercialization. We have also dedicated significant time and resources in designing a scalable manufacturing processes for producing and commercially deploying this battery technology.*

In fact, there is probably ***no greater vote of confidence than Volkswagen's announcement that they have decided to enter into a manufacturing joint venture with [Legacy] QuantumScape to prepare for mass production of these solid-state batteries for use by their company***. Based on our engagement with VW, we believe we are the only company to have successfully developed such a technology with automotive OEM validation.

* * *

Turning back to our product and technology – *we believe our lithium-metal battery technology is a game changer. Our solid-state battery technology addresses the key limitations of traditional lithium-ion battery technology*, and we think this positions EVs to be much more competitive with internal combustion engine vehicles that today account for 98% of all vehicles sold. Our technology is supported by more than 200 patents, including patents pending, and extensive trade secrets. ***These will be instrumental in keeping us ahead of the competitive curve.***

We believe ***our battery technology provides five key benefits*** as compared to traditional lithium-ion technology that makes our offering the ideal solution for use in electric vehicles:

• *Higher energy density*

• *Faster charge times*

• *Improved battery cycle life*

• *Enhanced safety, and*

• *Lower cost*

(Emphasis added.)

103.  The statements by Legacy QuantumScape, Kensington, and the Individual Defendants in ¶¶ 96–102 were materially false and misleading at the time they were made because they failed to disclose that: (1) then–Legacy QuantumScape's lithium-metal solid-state batteries did not have the supposed power, longevity, or energy density that they were being held out as having; (2) Legacy QuantumScape, and later the Company, did not have, and were extremely unlikely to soon develop, the ability to adapt their batteries to be readily usable in electric vehicles; and (3) as a result of the foregoing, the statements complained of herein about Legacy QuantumScape's and the Company's business and prospects were materially false and misleading at the time they were made.

## **False and Misleading Statements Made During the Relevant Period**

### *November 27, 2020 Press Release*

104.  On November 27, 2020, the Company issued a press release which announced the completion of the Merger and the commencement of QuantumScape's shares being traded on the NYSE. The press release described QuantumScape as "a leader in the development of next-generation solid-state lithium-metal batteries for use in electric vehicles" and stated, in relevant part, that:

> Since the company was founded in 2010, QuantumScape has been exclusively focused on developing solid-state batteries and designing a scalable manufacturing process to commercialize its battery technology for the automotive industry. ***Through its elegant "anode-less" design, QuantumScape's solid-state lithium-metal batteries are designed to be safer, and to deliver greater range, faster charge times and improved cycle life, than today's conventional lithium-ion battery technology.***
>
> "Today marks a big step in the evolution of our company," commented ***Jagdeep Singh***, Founder and Chief Executive Officer of QuantumScape. "***This transaction allows QuantumScape to fund development and commercialization of our OEM-validated battery technology as we look forward to playing our part in the electrification of the powertrain and fostering a cleaner future for all.***"

*Justin Mirro*, Chairman and Chief Executive Officer of Kensington, added, "we are incredibly excited to complete our business combination with QuantumScape and to provide the company with significant capital and automotive guidance to accelerate its business plan. The adoption of electric vehicles has emerged as the global mega-trend in the automotive industry, and *QuantumScape is now well positioned to become a leading supplier of solid-state batteries for this next generation of electric powertrains.*"

(Emphasis added.)

### December 8, 2020 Press Release

105.   On December 8, 2020, QuantumScape released a press release titled "QuantumScape Releases Performance Data for its Solid-State Battery Technology," touting that the Company's performance data for its solid-state battery technology "demonstrates high energy density solid-state lithium-metal battery technology that improves life, charging time, and safety."

106.   The press release stated, in pertinent part:

QuantumScape Corporation (NYSE: QS, or "QuantumScape"), a leader in the development of next generation solid-state lithium-metal batteries for use in electric vehicles (EVs) *has released performance data demonstrating that its technology addresses fundamental issues holding back widespread adoption of high-energy density solid-state batteries, including charge time (current density), cycle life, safety, and operating temperature.*

A commercially viable solid-state lithium-metal battery is an advancement that the battery industry has pursued for decades, as it *holds the promise of a step function increase in energy density over conventional lithium-ion batteries, enabling electric vehicles with a driving range comparable to combustion engine-based vehicles. QuantumScape's solid-state battery is designed to enable up to 80% longer range compared to today's lithium-ion batteries.* Previous attempts to create a solid-state separator capable of working with lithium metal at high rates of power generally required compromising other aspects of the cell (cycle life, operating temperature, safety, cathode loading, or excess lithium in the anode).

*QuantumScape's newly-released results*, based on testing of single layer battery cells, *show its solid-state separators are capable of working at very high rates of power, enabling a 15-minute charge to 80% capacity, faster than either conventional battery or alternative solid-state approaches are*

*capable of delivering. In addition, the data shows QuantumScape battery technology is capable of lasting hundreds of thousands of miles, and is designed to operate at a wide range of temperatures, including results that show operation at -30 degrees Celsius.*

The tested cells were large-area single-layer pouch cells in the target commercial form factor with zero excess lithium on the anode and thick cathodes (>3mAh/cm2), running at rates of one-hour charge and discharge (1C charge and 1C discharge) at 30 degrees Celsius. *These tests demonstrated robust performance of these single layer pouch cells even at these high rates, resulting in retained capacity of greater than 80% after 800 cycles (demonstrating high columbic efficiency of greater than 99.97%).*

"*The hardest part about making a working solid-state battery is the need to simultaneously meet the requirements of high energy density (1,000 Wh/L), fast charge (i.e., high current density), long cycle life (greater than 800 cycles), and wide temperature-range operation. This data shows QuantumScape's cells meet all of these requirements, something that has never before been reported. If QuantumScape can get this technology into mass production, it holds the potential to transform the industry,*" said Dr. Stan Whittingham, co-inventor of the lithium-ion battery and winner of the 2019 Nobel prize in chemistry.

"*These results blow away what was previously thought to be possible in a solid-state battery,*" said Venkat Viswanathan, battery expert and professor of materials science at Carnegie-Mellon University. "Supporting high enough current density to enable fast charge without forming dendrites has long been a holy grail of the industry. *This data shows the capability to charge to 80% capacity in 15 minutes, corresponding to an astonishingly high rate of lithium deposition of up to a micron per minute*."

"*We believe that the performance data we've unveiled today shows that solid-state batteries have the potential to narrow the gap between electric vehicles and internal combustion vehicles and help enable EVs to become the world's dominant form of transportation," said Jagdeep Singh*, founder & CEO of QuantumScape. "*Lithium-ion provided an important stepping stone to power the first generation of EVs. We believe QuantumScape's lithium-metal solid-state battery technology opens the automotive industry up to the next generation battery and creates a foundation for the transition to a more fully electrified automotive fleet.*"

* * *

Beyond its ability to function at high rates of power while delivering high energy density, other key characteristics of QuantumScape's solid-state lithium-metal battery technology include:

- **Zero excess lithium:** In addition to eliminating the carbon or carbon/silicon anode, QuantumScape's solid-state design further increases energy density because it uses no excess lithium on the anode. Some previous attempts at solid-state batteries used a lithium foil or other deposited-lithium anode, which reduces energy density.

- **Long life:** Because it eliminates the side reaction between the liquid electrolyte and the carbon in the anode of conventional lithium-ion cells, QuantumScape's battery technology is designed to last hundreds of thousands of miles of driving. Alternative solid-state approaches with a lithium metal anode typically have not demonstrated the ability to work reliably at close to room temperatures (30 degrees Celsius) with zero excess lithium at high current densities (>3mAh/cm2) for more than a few hundred cycles, and result in a short-circuit or capacity loss before the life target is met. By contrast, today's test results show that QuantumScape's battery technology is capable of running for over 800 cycles with greater than 80% capacity retention.

- **Low-temperature operation:** QuantumScape's solid-state separator is designed to operate at a wide range of temperatures, and it has been tested to -30 degrees Celsius, temperatures that render some other solid-state designs inoperable.

- **Safety:** QuantumScape's solid-state separator is noncombustible and isolates the anode from the cathode even at very high temperatures—much higher than conventional organic separators used in lithium-ion batteries.

(Emphasis added.)

### *December 2020 Registration Statement and Prospectus*

107.    On December 17, 2020, QuantumScape filed the Registration Statement with the SEC. The Registration Statement was signed by Defendants Singh, Hettrich, Blome, Buss, Doerr, Leohold, Prinz, Mirro, Straubel, and Saluja. In the "Risk Factors" section, the Registration Statement stated, in relevant part, that:

***We face significant barriers in our attempts to produce a solid-state battery cell and may not be able to successfully develop our solid-state battery cell. If we cannot successfully overcome those barriers, our business will be negatively impacted and could fail.***

Producing lithium-metal solid-state batteries that meet the requirements for wide adoption by automotive OEMs is a difficult undertaking. We are still in development stage and face significant challenges in completing development of our battery and in producing battery cells in commercial volumes. Some of the development challenges that could prevent the introduction of our solid-state battery cell include difficulties with increasing the yield of our separators and single-layer cells, multi-layer cell stacking, packaging engineering to ensure adequate cycle life, cost reduction, completion of the rigorous and challenging specifications required by our automotive partners, including but not limited to, calendar life, mechanical testing, and abuse testing and development of the final manufacturing processes.

Our solid-state separators are in the development stage. These separators have never been used before for battery applications (or to our knowledge, for any other applications) and there are significant yield, cost, performance and manufacturing process challenges to be solved in order for the separators to be produced and used commercially. We are likely to encounter engineering challenges as we increase the dimensions and reduce the thickness of its solid-state separators. If we are not able to overcome these barriers in developing and producing its solid-state separators, our business could fail.

To achieve target energy density, we need to stack our single-layer cells in a multi-layer format, which is enclosed within a single battery package. Depending upon our customer's requirements, our battery cell may require over one hundred single-layer battery cells within each battery package. We have not yet built a multi-layer solid-state battery cell in the dimensions required for automotive applications. There are significant developmental and mechanical challenges that we must overcome to build our multi-layer battery cell for automotive application. In addition, we will need to acquire certain tools that we currently do not possess and develop the manufacturing process necessary to make these multi-layer battery cells in high volume. If we are not able to overcome these developmental hurdles in building our multi-layer cells, our business is likely to fail.

We are evaluating multiple cathode material compositions for inclusion in our solid-state battery cells and have not yet finalized the cathode composition or

formulation. We also have not validated that the current cell design, with the inclusion of an organic gel made of an organic polymer and organic liquid catholyte as part of the cathode, meets all automotive requirements. We have not yet validated a manufacturing process or acquired the tools necessary to produce high volumes of our cathode material that meets all commercial requirements. If we are not able to overcome these developmental and manufacturing hurdles our business likely will fail.

Even if we complete development and achieve volume production of our solid-state battery, if the cost, performance characteristics or other specifications of the battery fall short of our targets, our sales, product pricing and margins would likely be adversely affected.

(Emphasis in original.)

108.   In addition, the Registration Statement identified, under a section titled, "Benefits of Our Technology," that QuantumScape's "battery technology will enable significant benefits across battery capacity, life, safety, and fast charging while minimizing cost." Moreover, the Registration Statement touted "five key requirements" that the batteries were intended to meet including:

- ***Energy density.*** Our battery design is intended to significantly increase volumetric and gravimetric energy density by eliminating the carbon/silicon anode host material found in conventional lithium-ion cells. This increased energy density will enable EV manufacturers to increase range without increasing the size and weight of the battery pack, or to reduce the size and weight of the battery pack which will reduce the cost of the battery pack and other parts of the vehicle. For example, we estimate that our solid-state battery cells will enable a car maker to increase the range of a luxury performance EV—with 350 liters of available battery space—from 250 miles (400 km) to 450 miles (730 km) without increasing the size and weight of the battery pack. In the same example, our battery would enable the car maker to increase the maximum power output of such a vehicle from 420 kW to 650 kW without increasing the size of the battery pack. Alternatively, we believe that our solid-state battery cells will enable a car maker to increase the range of a mass market sedan—with 160 liters of available battery space—from 123 miles (200km) to 233 miles (375km) without increasing the size and weight of the battery pack. Similarly, our battery

would enable the car maker to increase the maximum power output of such vehicle from 100 kW to 150 kW without increasing the size of the battery pack.

- ***Battery life.*** Our technology is expected to enable increased battery life relative to conventional lithium-ion batteries. In a conventional cell, battery life is limited by the gradual irreversible loss of lithium due to side reactions between the liquid electrolyte and the anode. By eliminating the anode host material, we expect to eliminate the side reaction and enable longer battery life. Our latest single layer prototype cells have been tested to over 800 cycles (under stringent test conditions, including 100% depth-of-discharge cycles at one-hour charge and discharge rates at 30 degrees Celsius with commercial-loading cathodes) while still retaining over 80% of the cells' discharge capacity.

- ***Fast charging capability.*** Our battery technology, and specifically our solid-state separator material, has been tested to demonstrate the ability to charge to approximately 80% in 15 minutes, faster than commonly used high-energy EV batteries on the market. In these conventional EV batteries, the limiting factor for charge rate is the rate of diffusion of lithium ions into the anode. If a conventional battery is charged beyond these limits, lithium can start plating on carbon particles of the anode rather than diffuse into the carbon particles. This causes a reaction between the plated lithium and liquid electrolyte which reduces cell capacity and increases the risk of dendrites that can short circuit the cell. With a lithium-metal anode, using our solid-state separator, we expect the lithium can be plated as fast as the cathode can deliver it.

- ***Increased safety.*** Our solid-state battery cell uses a ceramic separator which is not combustible and is therefore safer than conventional polymer separators. This ceramic separator is also capable of withstanding temperatures considerably higher than those that would melt conventional polymer separators, providing an additional measure of safety. In high temperature tests of our solid-state separator material with lithium, the separator material remained stable in direct contact with molten lithium without releasing heat externally, even when heated up to 250 degrees, higher than the 180-degree melting point of lithium.

- ***Cost.*** Our battery technology eliminates the anode host material and the associated manufacturing costs, providing a structural cost advantage compared to traditional lithium-ion batteries. We estimate that eliminating these costs will provide a savings of approximately 17% compared to the costs of building traditional lithium-ion batteries at leading manufacturers.

(Emphasis in original.)

109.   In addition, the Registration Statement stated the following, in relevant part, about the Company's internal controls: "Compliance with public company requirements will increase costs and make certain activities more time-consuming. A number of those requirements will require us to carry out activities we have not done previously. For example, we have created new Board committees and adopted new internal controls and disclosure controls and procedures. In addition, expenses associated with SEC reporting requirements will be incurred. Furthermore, if any issues in complying with those requirements are identified (for example, if the auditors identify a material weakness or significant deficiency in the internal control over financial reporting), we could incur additional costs rectifying those issues, and the existence of those issues could adversely affect our reputation or investor perceptions of it."

110.   On December 28, 2020, the Company filed Amendment No.1 to Form S-1 Registration Statement with the SEC. It was signed by Defendant Singh, who was also signing as attorney-in-fact on behalf of Defendants Blome, Buss, Doerr, Leohold, Prinz, Mirro, Straubel, and Saluja, and was signed by Defendant Hettrich. It failed to amend the false and misleading statements contained in the original. The Registration Statement, as amended, stated:

***We face significant barriers in our attempts to produce a solid-state battery cell and may not be able to successfully develop our solid-state battery cell. If we cannot successfully overcome those barriers, our business will be negatively impacted and could fail.***

Producing lithium-metal solid-state batteries that meet the requirements for wide adoption by automotive OEMs is a difficult undertaking. We are still in development stage and face significant challenges in completing development

of our battery and in producing battery cells in commercial volumes. Some of the development challenges that could prevent the introduction of our solid-state battery cell include difficulties with increasing the yield of our separators and single-layer cells, multi-layer cell stacking, packaging engineering to ensure adequate cycle life, cost reduction, completion of the rigorous and challenging specifications required by our automotive partners, including but not limited to, calendar life, mechanical testing, and abuse testing and development of the final manufacturing processes.

Our solid-state separators are in the development stage. These separators have never been used before for battery applications (or to our knowledge, for any other applications) and there are significant yield, cost, performance and manufacturing process challenges to be solved in order for the separators to be produced and used commercially. We are likely to encounter engineering challenges as we increase the dimensions and reduce the thickness of its solid-state separators. If we are not able to overcome these barriers in developing and producing its solid-state separators, our business could fail.

To achieve target energy density, we need to stack our single-layer cells in a multi-layer format, which is enclosed within a single battery package. Depending upon our customer's requirements, our battery cell may require over one hundred single-layer battery cells within each battery package. We have not yet built a multi-layer solid-state battery cell in the dimensions required for automotive applications. There are significant developmental and mechanical challenges that we must overcome to build our multi-layer battery cell for automotive application. In addition, we will need to acquire certain tools that we currently do not possess and develop the manufacturing process necessary to make these multi-layer battery cells in high volume. If we are not able to overcome these developmental hurdles in building our multi-layer cells, our business is likely to fail.

We are evaluating multiple cathode material compositions for inclusion in our solid-state battery cells and have not yet finalized the cathode composition or formulation. We also have not validated that the current cell design, with the inclusion of an organic gel made of an organic polymer and organic liquid catholyte as part of the cathode, meets all automotive requirements. We have not yet validated a manufacturing process or acquired the tools necessary to produce high volumes of our cathode material that meets all commercial requirements. If we are not able to overcome these developmental and manufacturing hurdles our business likely will fail.

43

Verified Shareholder Derivative Complaint

1
2
3
4

> Even if we complete development and achieve volume production of our
> solid-state battery, if the cost, performance characteristics or other
> specifications of the battery fall short of our targets, our sales, product pricing
> and margins would likely be adversely affected.

5

(Emphasis in original.)

6
7

111.   Moreover, the Registration Statement, as amended, stated, under a section titled, "Benefits of Our Technology," that QuantumScape's "battery technology will enable significant benefits across battery capacity, life, safety, and fast charging while minimizing cost." Moreover, the amended Registration Statement touted "five key requirements" that the batteries were intended to meet including:

8
9
10

- **_Energy density._** Our battery design is intended to significantly increase volumetric and gravimetric energy density by eliminating the carbon/silicon anode host material found in conventional lithium-ion cells. This increased energy density will enable EV manufacturers to increase range without increasing the size and weight of the battery pack, or to reduce the size and weight of the battery pack which will reduce the cost of the battery pack and other parts of the vehicle. For example, we estimate that our solid-state battery cells will enable a car maker to increase the range of a luxury performance EV—with 350 liters of available battery space—from 250 miles (400 km) to 450 miles (730 km) without increasing the size and weight of the battery pack. In the same example, our battery would enable the car maker to increase the maximum power output of such a vehicle from 420 kW to 650 kW without increasing the size of the battery pack. Alternatively, we believe that our solid-state battery cells will enable a car maker to increase the range of a mass market sedan—with 160 liters of available battery space—from 123 miles (200km) to 233 miles (375km) without increasing the size and weight of the battery pack. Similarly, our battery would enable the car maker to increase the maximum power output of such vehicle from 100 kW to 150 kW without increasing the size of the battery pack.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

- **_Battery life._** Our technology is expected to enable increased battery life relative to conventional lithium-ion batteries. In a conventional cell, battery life is limited by the gradual irreversible loss of lithium due to side reactions between the liquid electrolyte and the anode. By

26
27
28

eliminating the anode host material, we expect to eliminate the side reaction and enable longer battery life. Our latest single layer prototype cells have been tested to over 800 cycles (under stringent test conditions, including 100% depth-of-discharge cycles at one-hour charge and discharge rates at 30 degrees Celsius with commercial-loading cathodes) while still retaining over 80% of the cells' discharge capacity.

- ***Fast charging capability.*** Our battery technology, and specifically our solid-state separator material, has been tested to demonstrate the ability to charge to approximately 80% in 15 minutes, faster than commonly used high-energy EV batteries on the market. In these conventional EV batteries, the limiting factor for charge rate is the rate of diffusion of lithium ions into the anode. If a conventional battery is charged beyond these limits, lithium can start plating on carbon particles of the anode rather than diffuse into the carbon particles. This causes a reaction between the plated lithium and liquid electrolyte which reduces cell capacity and increases the risk of dendrites that can short circuit the cell. With a lithium-metal anode, using our solid-state separator, we expect the lithium can be plated as fast as the cathode can deliver it.

- ***Increased safety.*** Our solid-state battery cell uses a ceramic separator which is not combustible and is therefore safer than conventional polymer separators. This ceramic separator is also capable of withstanding temperatures considerably higher than those that would melt conventional polymer separators, providing an additional measure of safety. In high temperature tests of our solid-state separator material with lithium, the separator material remained stable in direct contact with molten lithium without releasing heat externally, even when heated up to 250 degrees, higher than the 180-degree melting point of lithium.

- ***Cost.*** Our battery technology eliminates the anode host material and the associated manufacturing costs, providing a structural cost advantage compared to traditional lithium-ion batteries. We estimate that eliminating these costs will provide a savings of approximately 17% compared to the costs of building traditional lithium-ion batteries at leading manufacturers.

(Emphasis in original.)

112.    In addition, the Registration Statement, as amended, stated, in relevant part, about the Company's internal controls: "Compliance with public company requirements will increase costs and make certain activities more time-consuming. A number of those requirements will require us to carry out activities we have not done previously. For example, we have created new Board committees and adopted new internal controls and disclosure controls and procedures. In addition, expenses associated with SEC reporting requirements will be incurred. Furthermore, if any issues in complying with those requirements are identified (for example, if the auditors identify a material weakness or significant deficiency in the internal control over financial reporting), we could incur additional costs rectifying those issues, and the existence of those issues could adversely affect our reputation or investor perceptions of it."

113.    On December 30, 2020, the Company filed Amendment No.2 to Form S-1 Registration Statement with the SEC. It was signed by Defendant Singh, who was also signing as attorney-in-fact on behalf of Defendants Blome, Buss, Doerr, Leohold, Prinz, Mirro, Straubel, and Saluja, and was signed by Defendant Hettrich. It failed to amend the false and misleading statements contained in the original and the first amended Registration Statement. The Registration Statement, as twice-amended, stated:

***We face significant barriers in our attempts to produce a solid-state battery cell and may not be able to successfully develop our solid-state battery cell. If we cannot successfully overcome those barriers, our business will be negatively impacted and could fail.***

Producing lithium-metal solid-state batteries that meet the requirements for wide adoption by automotive OEMs is a difficult undertaking. We are still in development stage and face significant challenges in completing development of our battery and in producing battery cells in commercial volumes. Some of the development challenges that could prevent the introduction of our solid-state battery cell include difficulties with increasing the yield of our separators and single-layer cells, multi-layer cell stacking, packaging engineering to ensure adequate cycle life, cost reduction, completion of the rigorous and challenging specifications required by our automotive partners, including but

not limited to, calendar life, mechanical testing, and abuse testing and development of the final manufacturing processes.

Our solid-state separators are in the development stage. These separators have never been used before for battery applications (or to our knowledge, for any other applications) and there are significant yield, cost, performance and manufacturing process challenges to be solved in order for the separators to be produced and used commercially. We are likely to encounter engineering challenges as we increase the dimensions and reduce the thickness of its solid-state separators. If we are not able to overcome these barriers in developing and producing its solid-state separators, our business could fail.

To achieve target energy density, we need to stack our single-layer cells in a multi-layer format, which is enclosed within a single battery package. Depending upon our customer's requirements, our battery cell may require over one hundred single-layer battery cells within each battery package. We have not yet built a multi-layer solid-state battery cell in the dimensions required for automotive applications. There are significant developmental and mechanical challenges that we must overcome to build our multi-layer battery cell for automotive application. In addition, we will need to acquire certain tools that we currently do not possess and develop the manufacturing process necessary to make these multi-layer battery cells in high volume. If we are not able to overcome these developmental hurdles in building our multi-layer cells, our business is likely to fail.

We are evaluating multiple cathode material compositions for inclusion in our solid-state battery cells and have not yet finalized the cathode composition or formulation. We also have not validated that the current cell design, with the inclusion of an organic gel made of an organic polymer and organic liquid catholyte as part of the cathode, meets all automotive requirements. We have not yet validated a manufacturing process or acquired the tools necessary to produce high volumes of our cathode material that meets all commercial requirements. If we are not able to overcome these developmental and manufacturing hurdles our business likely will fail.

Even if we complete development and achieve volume production of our solid-state battery, if the cost, performance characteristics or other specifications of the battery fall short of our targets, our sales, product pricing and margins would likely be adversely affected.

(Emphasis in original.)

114.   Moreover, the Registration Statement, as amended, stated, under a section titled, "Benefits of Our Technology," that QuantumScape's "battery technology will enable significant benefits across battery capacity, life, safety, and fast charging while minimizing cost." Moreover, the Registration Statement, as amended, touted "five key requirements" that the batteries were intended to meet including:

- ***Energy density.*** Our battery design is intended to significantly increase volumetric and gravimetric energy density by eliminating the carbon/silicon anode host material found in conventional lithium-ion cells. This increased energy density will enable EV manufacturers to increase range without increasing the size and weight of the battery pack, or to reduce the size and weight of the battery pack which will reduce the cost of the battery pack and other parts of the vehicle. For example, we estimate that our solid-state battery cells will enable a car maker to increase the range of a luxury performance EV—with 350 liters of available battery space—from 250 miles (400 km) to 450 miles (730 km) without increasing the size and weight of the battery pack. In the same example, our battery would enable the car maker to increase the maximum power output of such a vehicle from 420 kW to 650 kW without increasing the size of the battery pack. Alternatively, we believe that our solid-state battery cells will enable a car maker to increase the range of a mass market sedan—with 160 liters of available battery space—from 123 miles (200km) to 233 miles (375km) without increasing the size and weight of the battery pack. Similarly, our battery would enable the car maker to increase the maximum power output of such vehicle from 100 kW to 150 kW without increasing the size of the battery pack.

- ***Battery life.*** Our technology is expected to enable increased battery life relative to conventional lithium-ion batteries. In a conventional cell, battery life is limited by the gradual irreversible loss of lithium due to side reactions between the liquid electrolyte and the anode. By eliminating the anode host material, we expect to eliminate the side reaction and enable longer battery life. Our latest single layer prototype cells have been tested to over 800 cycles (under stringent test conditions, including 100% depth-of-discharge cycles at one-hour charge and discharge rates at 30 degrees Celsius with commercial-loading cathodes) while still retaining over 80% of the cells' discharge capacity.

- ***Fast charging capability.*** Our battery technology, and specifically our solid-state separator material, has been tested to demonstrate the ability to charge to approximately 80% in 15 minutes, faster than commonly used high-energy EV batteries on the market. In these conventional EV batteries, the limiting factor for charge rate is the rate of diffusion of lithium ions into the anode. If a conventional battery is charged beyond these limits, lithium can start plating on carbon particles of the anode rather than diffuse into the carbon particles. This causes a reaction between the plated lithium and liquid electrolyte which reduces cell capacity and increases the risk of dendrites that can short circuit the cell. With a lithium-metal anode, using our solid-state separator, we expect the lithium can be plated as fast as the cathode can deliver it.

- ***Increased safety.*** Our solid-state battery cell uses a ceramic separator which is not combustible and is therefore safer than conventional polymer separators. This ceramic separator is also capable of withstanding temperatures considerably higher than those that would melt conventional polymer separators, providing an additional measure of safety. In high temperature tests of our solid-state separator material with lithium, the separator material remained stable in direct contact with molten lithium without releasing heat externally, even when heated up to 250 degrees, higher than the 180-degree melting point of lithium.

- ***Cost.*** Our battery technology eliminates the anode host material and the associated manufacturing costs, providing a structural cost advantage compared to traditional lithium-ion batteries. We estimate that eliminating these costs will provide a savings of approximately 17% compared to the costs of building traditional lithium-ion batteries at leading manufacturers.

(Emphasis in original.)

115. In addition, the Registration Statement, as amended, stated the following, in relevant part, about the Company's internal controls: "Compliance with public company requirements will increase costs and make certain activities more time-consuming. A number of those requirements will require us to carry out activities we have not done previously. For example, we have created new Board committees and adopted new internal controls and disclosure controls and procedures. In addition, expenses associated with SEC

reporting requirements will be incurred. Furthermore, if any issues in complying with those requirements are identified (for example, if the auditors identify a material weakness or significant deficiency in the internal control over financial reporting), we could incur additional costs rectifying those issues, and the existence of those issues could adversely affect our reputation or investor perceptions of it."

116.    On December 31, 2020, the Company's Registration Statement was declared effective and the Prospectus was filed with the SEC. It contained the same false and misleading statements contained in the Registration Statement. The Prospectus stated:

> ***We face significant barriers in our attempts to produce a solid-state battery cell and may not be able to successfully develop our solid-state battery cell. If we cannot successfully overcome those barriers, our business will be negatively impacted and could fail.***
>
> Producing lithium-metal solid-state batteries that meet the requirements for wide adoption by automotive OEMs is a difficult undertaking. We are still in development stage and face significant challenges in completing development of our battery and in producing battery cells in commercial volumes. Some of the development challenges that could prevent the introduction of our solid-state battery cell include difficulties with increasing the yield of our separators and single-layer cells, multi-layer cell stacking, packaging engineering to ensure adequate cycle life, cost reduction, completion of the rigorous and challenging specifications required by our automotive partners, including but not limited to, calendar life, mechanical testing, and abuse testing and development of the final manufacturing processes.
>
> Our solid-state separators are in the development stage. These separators have never been used before for battery applications (or to our knowledge, for any other applications) and there are significant yield, cost, performance and manufacturing process challenges to be solved in order for the separators to be produced and used commercially. We are likely to encounter engineering challenges as we increase the dimensions and reduce the thickness of its solid-state separators. If we are not able to overcome these barriers in developing and producing its solid-state separators, our business could fail.
>
> To achieve target energy density, we need to stack our single-layer cells in a multi-layer format, which is enclosed within a single battery package. Depending upon our customer's requirements, our battery cell may require

over one hundred single-layer battery cells within each battery package. We have not yet built a multi-layer solid-state battery cell in the dimensions required for automotive applications. There are significant developmental and mechanical challenges that we must overcome to build our multi-layer battery cell for automotive application. In addition, we will need to acquire certain tools that we currently do not possess and develop the manufacturing process necessary to make these multi-layer battery cells in high volume. If we are not able to overcome these developmental hurdles in building our multi-layer cells, our business is likely to fail.

We are evaluating multiple cathode material compositions for inclusion in our solid-state battery cells and have not yet finalized the cathode composition or formulation. We also have not validated that the current cell design, with the inclusion of an organic gel made of an organic polymer and organic liquid catholyte as part of the cathode, meets all automotive requirements. We have not yet validated a manufacturing process or acquired the tools necessary to produce high volumes of our cathode material that meets all commercial requirements. If we are not able to overcome these developmental and manufacturing hurdles our business likely will fail.

Even if we complete development and achieve volume production of our solid-state battery, if the cost, performance characteristics or other specifications of the battery fall short of our targets, our sales, product pricing and margins would likely be adversely affected.

(Emphasis in original.)

117. Moreover, the Prospectus, under a section titled, "Benefits of Our Technology," that QuantumScape's "battery technology will enable significant benefits across battery capacity, life, safety, and fast charging while minimizing cost." Moreover, the Prospectus touted "five key requirements" that the batteries were intended to meet including:

- **_Energy density._** Our battery design is intended to significantly increase volumetric and gravimetric energy density by eliminating the carbon/silicon anode host material found in conventional lithium-ion cells. This increased energy density will enable EV manufacturers to increase range without increasing the size and weight of the battery pack, or to reduce the size and weight of the battery pack which will reduce the cost of the battery pack and other parts of the vehicle. For example, we estimate that our solid-state battery cells will enable a car

maker to increase the range of a luxury performance EV—with 350 liters of available battery space—from 250 miles (400 km) to 450 miles (730 km) without increasing the size and weight of the battery pack. In the same example, our battery would enable the car maker to increase the maximum power output of such a vehicle from 420 kW to 650 kW without increasing the size of the battery pack. Alternatively, we believe that our solid-state battery cells will enable a car maker to increase the range of a mass market sedan—with 160 liters of available battery space—from 123 miles (200km) to 233 miles (375km) without increasing the size and weight of the battery pack. Similarly, our battery would enable the car maker to increase the maximum power output of such vehicle from 100 kW to 150 kW without increasing the size of the battery pack.

- *Battery life.* Our technology is expected to enable increased battery life relative to conventional lithium-ion batteries. In a conventional cell, battery life is limited by the gradual irreversible loss of lithium due to side reactions between the liquid electrolyte and the anode. By eliminating the anode host material, we expect to eliminate the side reaction and enable longer battery life. Our latest single layer prototype cells have been tested to over 800 cycles (under stringent test conditions, including 100% depth-of-discharge cycles at one-hour charge and discharge rates at 30 degrees Celsius with commercial-loading cathodes) while still retaining over 80% of the cells' discharge capacity.

- *Fast charging capability.* Our battery technology, and specifically our solid-state separator material, has been tested to demonstrate the ability to charge to approximately 80% in 15 minutes, faster than commonly used high-energy EV batteries on the market. In these conventional EV batteries, the limiting factor for charge rate is the rate of diffusion of lithium ions into the anode. If a conventional battery is charged beyond these limits, lithium can start plating on carbon particles of the anode rather than diffuse into the carbon particles. This causes a reaction between the plated lithium and liquid electrolyte which reduces cell capacity and increases the risk of dendrites that can short circuit the cell. With a lithium-metal anode, using our solid-state separator, we expect the lithium can be plated as fast as the cathode can deliver it.

- *Increased safety.* Our solid-state battery cell uses a ceramic separator which is not combustible and is therefore safer than conventional

polymer separators. This ceramic separator is also capable of withstanding temperatures considerably higher than those that would melt conventional polymer separators, providing an additional measure of safety. In high temperature tests of our solid-state separator material with lithium, the separator material remained stable in direct contact with molten lithium without releasing heat externally, even when heated up to 250 degrees, higher than the 180-degree melting point of lithium.

- ***Cost.*** Our battery technology eliminates the anode host material and the associated manufacturing costs, providing a structural cost advantage compared to traditional lithium-ion batteries. We estimate that eliminating these costs will provide a savings of approximately 17% compared to the costs of building traditional lithium-ion batteries at leading manufacturers.

(Emphasis in original.)

118.   In addition, the Prospectus stated the following, in relevant part, about the Company's internal controls: "Compliance with public company requirements will increase costs and make certain activities more time-consuming. A number of those requirements will require us to carry out activities we have not done previously. For example, we have created new Board committees and adopted new internal controls and disclosure controls and procedures. In addition, expenses associated with SEC reporting requirements will be incurred. Furthermore, if any issues in complying with those requirements are identified (for example, if the auditors identify a material weakness or significant deficiency in the internal control over financial reporting), we could incur additional costs rectifying those issues, and the existence of those issues could adversely affect our reputation or investor perceptions of it."

119.   During the Relevant Period, the Individual Defendants and Defendant VGA breached their fiduciary duties by personally making and/or causing the Company to make the materially false and misleading statements referenced in ¶¶ 104–118. Specifically, the statements failed to disclose, *inter alia*, that: (1) QuantumScape's lithium-metal solid-state batteries did not have the supposed power, longevity, or energy density that they were

being held out as having; (2) the Company did not have, and was extremely unlikely to soon develop, the ability to adapt their batteries to be readily usable in electric vehicles; (3) as a result of the foregoing, the statements complained of herein about the Company's business and prospects were materially false and misleading at the time they were made; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, QuantumScape's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

120.   On January 4, 2020, the website *Seeking Alpha* published a report titled, "QuantumScape's Solid State Batteries Have Significant Technical Hurdles To Overcome."[2] The report noted that the overall "science [wa]s very good," but that the Company's "batteries are small and unproven – not yet as big as an iWatch battery, and never tested outside a lab." The report further cautioned that "[t]here are significant risks associated with solid state batteries that have not been overcome" and that "[t]hey will likely never achieve the performance they claim."

121.   In addition, the report by *Seeking Alpha* report noted under a section titled "Areas of Overstated Success," that:

> *All of these areas below are described as successful, because they are much better than has been achieved with solid state batteries in the past. But they are completely unacceptable for real world field electric vehicle performance.*
>
> • **Power:** They have done 1200 circuits of a 90 second OEM specified track simulation, which pulled pulses of 6C. In this track, 9 circuits is full depth of discharge, after which the battery was heated to 45 degrees C (113 degrees F) and charged to 80% in 15 minutes. The cell lost about 10% of its capacity in this 130 full depth-of-discharge (FDOD)cycle test, meaning ***the battery will only last for 260 FDOD cycles or about 75,000 miles of aggressive driving***. There is a note on the slide that it

---

[2] The report was slightly updated on January 13, 2020. The changes were mostly to clarify terms and did not affect the substance of its conclusions.

occurs at 3.4 atm, which likely means at high pressure. I'll comment on this later.

- **Range:** In much gentler, 1C / 1C cycling at 30 degrees C, the cell makes it for 800 cycles, or 240,000 miles. ***Respectable, but not better than the vehicles on the road today.***

- **Low Temperature Operation:** They show discharge curves at 0 to -30 degrees Celsius, achieving 90 - 130 mAh/g active specific capacity. Comparing to NMC811 active specific capacity of 200 Ah/kg, the available current is from 45 - 65% of the room temperature capacity, but with an accompanying significant voltage drop. Based on voltage drop, capacity loss and the low rate of this test, this author estimates between a 50 – 80% loss in range during cold months. Also, note that the temperature capability of solid state batteries is VERY temperature sensitive – thus the power and cycle tests at 30 and 45 degrees above would have been significantly worse if run even a few degrees lower.

- **Low Temperature Life:** They show 100 or so cycles at -10 degrees C. Respectable, except that these cycles are at C/5 charge and C/3 discharge. Thus, not 80% in 15 minutes, but rather 5% charge in 15 minutes.

- **Energy Density:** ***They talk about being able to get to an energy density of 400 Wh/kg, which would be great. However, they clearly have not yet***, as all their graphs are normalized to 100%, not to an actual capacity. ***And Amprius is already making cells with 450 Wh/kg***, and Tesla claimed on their Battery Day that they could achieve 350 Wh/kg. ***So, while nice, this energy density they hope to achieve in 2028 will not beat today's state of the art, and will not be state of the art when it is achieved.***

(Emphasis added.)

122. The *Seeking Alpha* report further revealed, in a section titled, "Other Significant Challenges," that:

> ***There are other challenges they do not mention***, which will have to be overcome before they can put the first car in the field. ***Remember that they have spent $300 million so far, so these are not challenges that they didn't have the resources to address, but rather ones they have not solved yet and***

*so remain silent about.* Many of these are related, and come from the fact that they are using a brittle, ceramic electrolyte. These include:

- **Multi-layer cells:** They have been unable to make multi-layer cells. My expectation is that it is because of the unstable interface between the cathode, which expands as much as 10% on discharge, and the solid state electrolyte, which will not expand at all. They likely do their cycling under high isostatic pressure (remember the 3.4 atm mentioned earlier?), which will not flow through to inner layers. The inner layers will also be more rigidly constrained, so suffer more from the interfacial decay with cycling. Needless to say, 100,000 of their tiny pouch cells will never make a practical vehicle. It's important to mention here that, if your technology works, making a multilayer pouch cell is an easy afternoon's work.

- **Vibration and Dendrites:** The electrolyte is very, very stiff. It is well documented that dendrites will not grow through solid, single crystal garnet electrolytes. However, they grow freely at grain boundaries and defects. In their pristine, temperature and pressure controlled and vibration-free labs, they can get the cells to cycle. But in a rugged SUV or on our terrible South Carolina roads, cracks and other defects will become plentiful and dendrites will grow. This will in the best case destroy cycle life, and in the worst cause the battery to explode.

- **Lithium Metal Ignition:** They tout using lithium metal to increase energy density. But they don't mention that lithium metal auto-ignites at 179 degrees Celsius, generating 200 - 300 kJ/mol, or 30 - 40 kJ/g, a massive amount of energy - about *three times higher* than ethylene carbonate, a common component of lithium ion electrolytes. Pure lithium is the second most energetic element behind beryllium, and could be used as a component of rocket fuel (with an oxidant). In essence, they have replaced a burning separator and electrolyte for a much more flammable and energetic burning anode. There is plenty enough energy in the battery to raise the lithium to its ignition temperature, and if exposed to oxygen or water, it will likely ignite itself. There is plenty of oxygen available in the cathode materials. …

- **Cost**: *They claim lower cost*, but are actually eliminating only one of the least expensive components - graphite. *While this is true, they will have the added cost of building up their thin ceramic electrolyte and*

*sintering it at high temperatures.* My guess is that early on, their yields will be just terrible, if they can achieve production scale at all.

(Emphasis added.)

123.   To close, the *Seeking Alpha* report stated the following under "Summary," in relevant part:

Given their success so far and their access to capital, I do think QuantumScape will succeed in getting a battery to market. However:

- *It will have lower energy density* than Amprius has achieved today.

- It will likely first show up in watches and wearables, then maybe phones.

- *It will take much longer and cost much more* to scale than they think.

- *It will not be able to withstand the aggressive automotive environment*.

- *It will be far more expensive* than today's lithium ion batteries, and will likely never achieve lower cost than contemporary lithium ion batteries.

- Once a suitable cell size is made, *it may not be any safer* than today's lithium ion batteries.

(Emphasis added.)

124.   On news of this report, the Company's share price declined by approximately 40.8%, or $34.49, from closing at $84.45 per share on December 31, 2020, the previous day of trading and the day of the SPO, to closing at $49.96 per share on January 4, 2021.

125.   In the meanwhile, in the course of the SPO on December 31, 2020, at least four and as many as eight Individual Defendants and Defendant VGA sold shares at prices inflated by the numerous false and misleading statements.

## **DAMAGES TO QUANTUMSCAPE**

126.   As a direct and proximate result of the Individual Defendants' and Defendant VGA's misconduct, QuantumScape has lost and will continue to lose and expend many millions of dollars.

127.   Such expenditures include, but are not limited to, fees associated with the three Securities Class Actions filed against the Company and the Company's CEO, including one of the three Securities Class Actions which is also filed against the Company's CFO, CTO, Defendant Prinz, and Defendant VGA, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

128.   Additionally, these expenditures include, but are not limited to, lavish compensation, benefits, and other payments provided to the Individual Defendants and Defendant VGA who breached their fiduciary duties to the Company.

129.   As a direct and proximate result of the Individual Defendants' and Defendant VGA's conduct, QuantumScape has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' and Defendant VGA's breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE ALLEGATIONS**

130.   Plaintiff brings this action derivatively and for the benefit of QuantumScape to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' and Defendant VGA's breaches of their fiduciary duties as directors and/or officers of QuantumScape, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

131.   QuantumScape is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

132.   Plaintiff is, and has been at all relevant times, a shareholder of QuantumScape. Plaintiff will adequately and fairly represent the interests of QuantumScape in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

133.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

134.   A pre-suit demand on the Board of QuantumScape is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten individuals: Defendants Singh, Prinz, Blome, Buss, Doerr, Leohold, Mirro, Saluja, and Straubel (the "Director-Defendants"), and nonparty Wiese (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors who are on the Board at the time this action is commenced.

135.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while at least two and as many as six of them sold shares at inflated prices as part of the SPO, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

136.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

137. Additional reasons that demand on Defendant Singh is futile follow. Defendant Singh has served as the Company's CEO and Chairman of the Board since the Merger in November 2020. Prior to the Merger, he cofounded Legacy QuantumScape in May 2010 and served as its CEO and as a director there from that time until the completion of the Merger. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Singh with his principal occupation, and he receives handsome compensation as described above. As CEO, Defendant Singh was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the Registration Statement, originally and as amended, which he signed. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he sold shares at inflated prices in the SPO. Moreover, Defendant Singh is a defendant in the Securities Class Actions. Additionally, he and Defendants Prinz, Holme, Hettrich, Blome, Buss, Doerr, Leohold, Saluja, and Straubel all served simultaneously at Legacy QuantumScape, in various capacities, as is detailed further below. For these reasons, Defendant Singh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138. Additional reasons that demand on Defendant Prinz is futile follow. Defendant Prinz has served as a Company director since the Merger in November 2020. Prior to the Merger, he had served on the Board of Legacy QuantumScape with Defendants Singh and Doerr since December 2010. Defendant Prinz is entitled to significant compensation for his services. He signed the Registration Statement and the two subsequent amendments thereto, rendering him personally responsible for the false and misleading statements contained therein. As a trusted Company director, he conducted

little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he sold shares at inflated prices in the SPO. Moreover, he is a defendant in one of the three Securities Class Actions. Additionally, he and Defendants Singh, Holme, Hettrich, Blome, Buss, Doerr, Leohold, Saluja, and Straubel all served simultaneously at Legacy QuantumScape, in various capacities, as is detailed further below. For these reasons, Defendant Prinz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139.   Additional reasons that demand on Defendant Blome is futile follow. Defendant Blome has served as a Company director since the Merger in November 2020. He also serves as a member of the Company's Nominating and Corporate Governance Committee. Prior to the Merger, he had served on the board of Legacy QuantumScape since September 2020. Moreover, Defendant Blome is an affiliate of Defendant VGA, having been nominated to the Board by it and having served as Head of Volkswagen's Battery Center of Excellence since January 2018. In light of this position, Defendant Blome is beholden to Defendant VGA and cannot independently or disinterestedly consider an action against it. Defendant Blome is entitled to significant compensation for his role at the Company. He signed the Registration Statement and the two subsequent amendments thereto, rendering him personally responsible for the false and misleading statements contained therein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he and Defendants Singh, Prinz, Holme, Hettrich, Buss, Doerr, Leohold, Saluja, and Straubel all served simultaneously at Legacy QuantumScape, in various capacities, as is detailed

further below. For these reasons, Defendant Blome breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

140.   Additional reasons that demand on Defendant Buss is futile follow. Defendant Buss has served as a Company director since the Merger in November 2020. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee. Prior to the Merger, he had served on the board of Legacy QuantumScape since August 2020. Defendant Buss is entitled to significant compensation for his role at the Company. He signed the Registration Statement and the two subsequent amendments thereto, rendering him personally responsible for the false and misleading statements contained therein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he is listed in the Prospectus as offering shares of Company common stock in the SPO. Moreover, he and Defendants Singh, Prinz, Holme, Hettrich, Blome, Doerr, Leohold, Saluja, and Straubel all served simultaneously at Legacy QuantumScape, in various capacities, as is detailed further below. For these reasons, Defendant Buss breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141.   Additional reasons that demand on Defendant Doerr is futile follow. Defendant Doerr has served as a Company director since the Merger in November 2020. He also serves as a member of the Nominating and Corporate Governance Committee. Prior to the Merger, he had served on the board of Legacy QuantumScape since December 2010 with Defendants Singh and Prinz. Defendant Doerr is entitled to significant compensation for his role at the Company. He signed the Registration Statement and the two subsequent amendments thereto, rendering him personally responsible for the false and

Verified Shareholder Derivative Complaint

misleading statements contained therein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he and Defendants Singh, Prinz, Holme, Hettrich, Blome, Buss, Leohold, Saluja, and Straubel all served simultaneously at Legacy QuantumScape, in various capacities, as is detailed further below. For these reasons, Defendant Doerr breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142. Additional reasons that demand on Defendant Leohold is futile follow. Defendant Leohold has served as a Company director since the Merger in November 2020. He also serves as Chair of the Compensation Committee. Prior to the Merger, he had served on the board of Legacy QuantumScape since May 2015, alongside with Defendants Singh, Prinz, Doerr, and Saluja. Moreover, he served in various executive, management, and consulting positions with Volkswagen from April 2006 to May 2019. Defendant Leohold is entitled to significant compensation for his role at the Company. He signed the Registration Statement and the two subsequent amendments thereto, rendering him personally responsible for the false and misleading statements contained therein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he is listed in the Prospectus as offering shares of Company common stock in the SPO. Moreover, he and Defendants Singh, Prinz, Holme, Hettrich, Blome, Buss, Doerr, Saluja, and Straubel all served simultaneously at Legacy QuantumScape, in various capacities, as is detailed further below. For these reasons, Defendant Leohold breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.    Additional reasons that demand on Defendant Mirro is futile follow. Defendant Mirro has served as a Company director since the Merger in November 2020. He also serves as Lead Independent Director, as Chair of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee. Prior to the Merger, he served as Chairman and CEO of the Company's predecessor, Kensington. Defendant Mirro is entitled to significant compensation for his role at the Company. He signed the Registration Statement and the two subsequent amendments thereto, rendering him personally responsible for the false and misleading statements contained therein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he is listed in the Prospectus as offering shares of Company common stock in the SPO. For these reasons, Defendant Mirro breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144.    Additional reasons that demand on Defendant Saluja is futile follow. Defendant Saluja has served as a Company director since the Merger in November 2020. He also serves as a member of the Audit Committee. Prior to the Merger, he had served on the board of Legacy QuantumScape since December 2012 with Defendants Singh, Prinz, and Doerr. Defendant Saluja is entitled to significant compensation for his role at the Company. He signed the Registration Statement and the two subsequent amendments thereto, rendering him personally responsible for the false and misleading statements contained therein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the

scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he and Defendants Singh, Prinz, Holme, Hettrich, Blome, Buss, Doerr, Leohold, and Straubel all served simultaneously at Legacy QuantumScape, in various capacities, as is detailed further below. For these reasons, Defendant Saluja breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145. Additional reasons that demand on Defendant Straubel is futile follow. Defendant Straubel has served as a Company director since the Merger in November 2020. He also serves as a member of the Compensation Committee. Prior to the Merger, he had served on the Board of Legacy QuantumScape since December 2019. Defendant Straubel is entitled to significant compensation for his role at the Company. He signed the original Registration Statement and the two subsequent amendments thereto, rendering him personally responsible for the false and misleading statements contained therein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he is listed in the Prospectus as offering shares of Company common stock in the SPO. Moreover, he and Defendants Singh, Prinz, Holme, Hettrich, Blome, Buss, Doerr, Leohold, and Saluja all served simultaneously at Legacy QuantumScape, in various capacities, as is detailed further below. For these reasons, Defendant Straubel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146. Additional reasons that demand on nonparty Wiese is futile follow. He is one of two appointees to the Board made by Defendant VGA. He is a VGA affiliate and currently Head of Volkswagen Group M&A, Investment Advisory, and Partnerships since January 2020. Prior to this he had numerous roles at Volkswagen over an extended period

going back to 2016, including Head of Industrial Cooperations and Partnerships from June 2018 to December 2019, Head of Group Battery Strategy from June 2016 to December 2019, and Corporate Strategy/Head of Performance Improvement from March 2016 to May 2018. In light of this longstanding relationship and his being appointed by VGA, Wiese is beholden to Defendant VGA and cannot independently or disinterestedly consider an action against it. Therefore, demand upon him is futile and thus excused.

147.    Additional reasons that demand on the Board is futile follow.

148.    The Director-Defendants have longstanding business and personal relationships with each other and the Company that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendants Singh, Prinz, Holme, Hettrich, Blome, Buss, Doerr, Leohold, Saluja, and Straubel all served simultaneously at Legacy QuantumScape, rendering the Director-Defendants unable to independently and disinterestedly consider this action against themselves and the other Individual Defendants. Defendant Singh began serving as Chairman of Legacy QuantumScape's board, and served as CEO, since May 2010. Shortly thereafter, he was joined on Legacy QuantumScape's board by Defendants Prinz and Doerr, in December 2010. Defendant Holme then joined Legacy QuantumScape as CTO in January 2011, a role he continues to hold at the Company. Defendant Hettrich joined Legacy QuantumScape a year later in January 2012, serving in various managerial and executive positions culminating in his being named CFO in September 2018, a role he continues to hold with the Company. Shortly after Defendant Hettrich joined Legacy QuantumScape, Defendant Saluja, too, joined, as a director, in August 2012. This was followed three years later by Defendant Leohold joining the board of Legacy QuantumScape, in May 2015, while he was still working at Volkswagen, where he would continue to work while serving on the Board for four more years. Defendant Straubel is added to the board of Legacy QuantumScape in December 2019, followed by Defendant Buss in August 2020. They all survived through the merger to work at the Company now.

Defendants Singh, Prinz, Doerr, and Holme have worked together for a decade or more, and Defendant Holme, Hettrich, and Saluja have worked with them for fairly close to that. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

149.   Defendants Buss, Mirro, and Saluja (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the quality and integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements, internal controls, failed to ensure compliance with laws and regulations as they are charged to do under the Audit Committee Charter, and failed to prevent the Company from issuing false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

150.   Defendants Buss, Leohold, and Straubel (the "Compensation Committee Defendants") served as members of the Compensation Committee and approved excessive compensation for the Individual Defendants. The Compensation Committee Defendants engaged in the scheme to issue false and misleading statements and not only failed to take action to correct or prevent it but rewarded it. They failed to uphold their responsibilities with integrity and rewarded the Individual Defendants for their misconduct. Thus, the Compensation Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

151.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' and Defendant VGA's scheme to issue materially false and misleading statements to the public

and to facilitate and disguise the Individual Defendants' and Defendant VGA's violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

152.    QuantumScape has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for QuantumScape any part of the damages QuantumScape suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

153.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

154.    The acts complained of herein constitute violations of fiduciary duties owed by QuantumScape's officers and directors, and these acts are incapable of ratification.

155.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their

protection with corporate funds, i.e., monies belonging to the stockholders of QuantumScape. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of QuantumScape, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

156.   If there is no directors' and officers' liability insurance, then the Directors will not cause QuantumScape to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

157.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants and Defendant VGA for Breach of Fiduciary Duties

158.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

159.   Each Individual Defendant and Defendant VGA owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of QuantumScape's business and affairs.

160.   Each of the Individual Defendants and Defendant VGA violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

161.   The Individual Defendants' and Defendant VGA's conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants and Defendant VGA intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of QuantumScape.

162.   In breach of their fiduciary duties owed to QuantumScape, the Individual Defendants and Defendant VGA willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) QuantumScape's lithium-metal solid-state batteries did not have the power, longevity, or energy density that they were being held out as having; (2) the Company does not have, and is extremely unlikely to soon develop, the ability to adapt their batteries to be readily usable in electric vehicles; (3) as a result of the foregoing, the statements complained of herein about the Company's business and prospects were materially false and misleading at the time they were made; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, QuantumScape's public statements were materially false and misleading at all relevant times.

163.   The Individual Defendants and Defendant VGA failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, while at least four and as many as eight of the Individual Defendants and Defendant VGA sold shares at inflated prices in the SPO, which renders them personally liable to the Company for breaching their fiduciary duties.

164.   Also in breach of their fiduciary duties, the Individual Defendants and Defendant VGA caused the Company to fail to maintain internal controls.

165.   The Individual Defendants and Defendant VGA had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants and Defendant VGA had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of QuantumScape's securities.

166.   The Individual Defendants and Defendant VGA had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants and Defendant VGA had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of QuantumScape's securities. The Individual Defendants and Defendant VGA, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

167.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

168.   As a direct and proximate result of the Individual Defendants' and Defendant VGA's breaches of their fiduciary obligations, QuantumScape has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants and Defendant VGA are liable to the Company.

169.   Plaintiff on behalf of QuantumScape has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants and Defendant VGA for Unjust Enrichment

170.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

171.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants and Defendant VGA were unjustly enriched at the expense of, and to the detriment of, QuantumScape.

172.   The Individual Defendants and Defendant VGA either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from QuantumScape that was tied to the performance or artificially inflated valuation of QuantumScape, or received compensation or other payments that were unjust in light of the Individual Defendants' and Defendant VGA's bad faith conduct.

173.   Plaintiff, as a shareholder and a representative of QuantumScape, seeks restitution from the Individual Defendants and Defendant VGA and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants and Defendant VGA due to their wrongful conduct and breach of their fiduciary and contractual duties.

174.   Plaintiff on behalf of QuantumScape has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants and Defendant VGA for Abuse of Control

175.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

176.   The Individual Defendants' and Defendant VGA's misconduct alleged herein constituted an abuse of their ability to control and influence QuantumScape, for which they are legally responsible.

177.   As a direct and proximate result of the Individual Defendants' and Defendant VGA's abuse of control, QuantumScape has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants and Defendant VGA are liable to the Company.

178.   Plaintiff on behalf of QuantumScape has no adequate remedy at law.

## FOURTH CLAIM

**Against Individual Defendants and Defendant VGA for Gross Mismanagement**

179.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

180.   By their actions alleged herein, the Individual Defendants and Defendant VGA, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of QuantumScape in a manner consistent with the operations of a publicly-held corporation.

181.   As a direct and proximate result of the Individual Defendants' and Defendant VGA's gross mismanagement and breaches of duty alleged herein, QuantumScape has sustained and will continue to sustain significant damages.

182.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants and Defendant VGA are liable to the Company.

183.   Plaintiff on behalf of QuantumScape has no adequate remedy at law.

## FIFTH CLAIM

**Against Individual Defendants and Defendant VGA for Waste of Corporate Assets**

184.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

185.   The Individual Defendants and Defendant VGA caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

186.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants and Defendant VGA have caused QuantumScape to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

187.   As a result of the waste of corporate assets, the Individual Defendants and Defendant VGA are each liable to the Company.

188.   Plaintiff on behalf of QuantumScape has no adequate remedy at law.

## SIXTH CLAIM

### Against Defendants Singh, Prinz, Holme, Hettrich, and VGA for Contribution Under Sections 10(b) and 21D of the Exchange Act

189.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

190.   QuantumScape, and Defendant Singh, are named as defendants in all three of the Securities Class Actions, and Defendants Prinz, Holme, Hettrich, and VGA are named as defendants in one of the three Securities Class Actions, which each assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Singh's, Prinz's, Holme's, Hettrich's, and VGA's willful and/or reckless violations of their obligations as controlling shareholder, officers, and/or directors of QuantumScape.

191.   Defendants Singh, Prinz, Holme, Hettrich, and VGA because of their positions of control and authority as CEO, director, CTO, CFO, and controlling shareholder of QuantumScape, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of QuantumScape, including the wrongful acts complained of herein and in the Securities Class Actions.

192.   Accordingly, Defendants Singh, Prinz, Holme, Hettrich, and VGA are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

193.   As such, QuantumScape is entitled to receive all appropriate contribution or indemnification from Defendants Singh, Prinz, Holme, Hettrich, and VGA.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants and Defendant VGA as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of QuantumScape, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants and Defendant VGA have breached and/or aided and abetted the breach of their fiduciary duties to QuantumScape;

(c)   Determining and awarding to QuantumScape the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants and Defendant VGA, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing QuantumScape, the Individual Defendants, and Defendant VGA to take all necessary actions to reform and improve QuantumScape's corporate governance and internal procedures to comply with applicable laws and to protect QuantumScape and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions

for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

        1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

        2. a provision to permit the shareholders of QuantumScape to nominate at least five candidates for election to the Board;

        3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

    (e)    Awarding QuantumScape restitution from Individual Defendants and Defendant VGA, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: February 8, 2021        Respectfully submitted,

        **THE BROWN LAW FIRM, P.C.**
        *s/Robert C. Moest*
        Robert C. Moest, Of Counsel, SBN 62166
        2530 Wilshire Boulevard, Second Floor
        Santa Monica, California 90403
        Telephone: (310) 915-6628
        Facsimile: (310) 915-9897
        Email: RMoest@aol.com

        **THE BROWN LAW FIRM, P.C.**
        Timothy Brown

240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## <u>VERIFICATION</u>

I,        Hugues Gervat am        a        plaintiff in        the        within        action.
I have reviewed the allegations made in this verified consolidated
shareholder derivative complaint, know the contents thereof, and authorize its filing.
To those allegations of which I have personal knowledge, I believe those allegations
to be true. As to those allegations of which I do not have personal knowledge, I rely upon
my counsel and their investigation and believe them to be true.

I declare under penalty ~~DocuSigned by:~~ foregoing is true and correct. Executed this _th
2/8/2021
day of _____, 2021.

**Hugues Gervat**

2F6AF3BA1A3040E...

Hugues Gervat